No. 19-2546

# In the United States Court of Appeals for the Seventh Circuit

---

ERIC WHITE,
individually and on behalf of all others similarly situated,
*Plaintiff-Appellant*,

v.

UNITED AIRLINES, INC. and UNITED CONTINENTAL HOLDINGS, INC.,
*Defendants-Appellees*.

---

On Appeal from the United States District Court
for the Northern District of Illinois
Case No.19-cv-00114 (The Hon. Charles R. Norgle, Sr.)

## SHORT APPENDIX

POOJA SHETHJI
OUTTEN & GOLDEN LLP
601 Massachusetts Ave. NW, Suite 200w
Washington, DC 20001
(202) 847-4400
*pshethji@outtengolden.com*

PAUL W. MOLLICA
OUTTEN & GOLDEN LLP
161 North Clark Street, Suite 1600
Chicago, IL 60601
(312) 809-7010
*pwmollica@outtengolden.com*

DEEPAK GUPTA
JONATHAN E. TAYLOR
PETER ROMER-FRIEDMAN
GUPTA WESSLER PLLC
1900 L Street NW, Suite 312
Washington, DC 20036
(202) 888-1741
*deepak@guptawessler.com*
*jon@guptawessler.com*

R. JOSEPH BARTON
BLOCK & LEVITON LLP
1735 20th Street NW
Washington, DC 20009
(202) 734-7046
*jbarton@blockesq.com*

*Counsel for Plaintiff-Appellant*
*(additional counsel listed on inside cover)*

April 17, 2020

MATTHEW Z. CROTTY
CROTTY & SON LAW FIRM, PLLC
905 W. Riverside Ave., Suite 404
Spokane, WA 99201
(509) 850-7011
matt@crottyandson.com

THOMAS G. JARRARD
LAW OFFICE OF
THOMAS G. JARRARD LLC
1020 N. Washington Street
Spokane, WA 99201
(425) 239-7290
tjarrard@att.net

# TABLE OF CONTENTS

District Court Docket Sheet ..............................................................................Appx1

ECF No. 27 Amended Complaint (03/29/2019) ............................................Appx6

ECF No. 32-1 Declaration of Lincoln Lounsbury in Support of
Motion to Dismiss Amended Complaint (04/19/2019)................................Appx39

    Exhibit A (04/19/2019) ......................................................Appx41

    Exhibit B (04/19/2019) ......................................................Appx56

ECF No. 44 District Court's Opinion and Order Granting Defendant's
Motion to Dismiss Amended Complaint (07/10/2019)................................Appx94

ECF No. 45 District Court Judgment (07/10/2019) ....................................Appx98

## United States District Court
## Northern District of Illinois – CM/ECF LIVE, Ver 6.3.2 (Chicago)
## CIVIL DOCKET FOR CASE #: 1:19–cv–00114

White v. United Airlines, Inc. et al
Assigned to: Honorable Charles R. Norgle, Sr
Case in other court:  19–02546
Cause: 28:1331 Federal Question

Date Filed: 01/07/2019
Date Terminated: 07/10/2019
Jury Demand: Both
Nature of Suit: 442 Civil Rights: Jobs
Jurisdiction: Federal Question

**Plaintiff**

**Eric White**                          represented by   **Robert Joseph Barton**
Block & Leviton LLP
1735 20th Street
Washington DC, DC 20009
202–734–7046
Email: jbarton@blockesq.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Zachary Crotty**
Crotty & Son Law Firm, PLLC
Ste. 404
905 W. Riverside Ave
Spokane, WA 99201
(509) 850–7011
Email: matt@crottyandson.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Pooja Shethji**
Outten & Golden LLP
601 Massachusetts Avenue NW
Suite 200W
Washington, DC 20001
(202) 847–4400
Email: pshethji@outtengolden.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Thomas Gregory Jarrard**
Law Office Of Thomas G. Jarrard
1020 N Washington
Spokane, WA 99201
(425) 239–7290
Email: Tjarrard@att.net
*ATTORNEY TO BE NOTICED*

**Peter Romer–Friedman**
Gupta Wessler PLLC
1900 L St NW, Suite 312
Washington, DC 20036
(202) 888–1741
Email: peter@guptawessler.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**United Airlines, Inc.**                          represented by

**Appx1**

**Michael J Gray**
Jones Day (CH)
77 West Wacker Drive
Chicago, IL 60601
(312)782–3939
Email: mjgray@jonesday.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alice V. Brathwaite**
Jones Day
77 West Wacker
Suite 3500
Chicago, IL 60642
(312) 269–4109
Email: abrathwaite@jonesday.com
*TERMINATED: 06/27/2019*

**Ann–Marie Woods**
Jones Day (CH)
77 West Wacker Drive
Chicago, IL 60601
(312)782–3939
Email: awoods@jonesday.com
*ATTORNEY TO BE NOTICED*

**Douglas W. Hall**
Jones Day
51 Louisiana Avenue, NW
Washington, DC 20001
(202) 879–5432
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer Lucia Ralph**
Jones Day
77 West Wacker Dr.
Chicago, IL 60657
(312) 269–4116
Email: jralph@jonesday.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**United Continental Holdings, Inc.**     represented by   **Michael J Gray**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alice V. Brathwaite**
(See above for address)
*TERMINATED: 06/27/2019*

**Ann–Marie Woods**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Douglas W. Hall**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jennifer Lucia Ralph**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/07/2019 | 1 | COMPLAINT filed by Eric White; Jury Demand. (Romer–Friedman, Peter) (Entered: 01/07/2019) |
| 01/07/2019 | 2 | CIVIL Cover Sheet (Romer–Friedman, Peter) (Entered: 01/07/2019) |
| 01/07/2019 | 3 | ATTORNEY Appearance for Plaintiff Eric White by Peter Romer–Friedman (Romer–Friedman, Peter) (Entered: 01/07/2019) |
| 01/07/2019 | | CASE ASSIGNED to the Honorable Charles R. Norgle, Sr. Designated as Magistrate Judge the Honorable Jeffrey T. Gilbert. FEE DUE, NO INFORMA PAUPERIS APPLICATION SUBMITTED. Case assignment: Random assignment. (jjr, ) (Entered: 01/07/2019) |
| 01/07/2019 | 4 | ATTORNEY Appearance for Plaintiff Eric White by Robert Joseph Barton (Barton, Robert) (Entered: 01/07/2019) |
| 01/08/2019 | | SUMMONS Issued as to Defendants United Airlines, Inc., United Continental Holdings, Inc. (jjr, ) (Entered: 01/08/2019) |
| 01/09/2019 | 5 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752–15349179. (Crotty, Matthew) (Entered: 01/09/2019) |
| 01/09/2019 | 6 | MOTION by Plaintiff Eric White to be Declared Exempt from Filing Fees Under 38 U.S.C. § 4323(h)(1) (Romer–Friedman, Peter) (Entered: 01/09/2019) |
| 01/09/2019 | 7 | NOTICE of Motion by Peter Romer–Friedman for presentment of motion for miscellaneous relief 6 before Honorable Charles R. Norgle Sr. on 1/18/2019 at 10:30 AM. (Romer–Friedman, Peter) (Entered: 01/09/2019) |
| 01/10/2019 | 8 | ORDER Declaring This Action Exempt from Filing Fees Under 38 U.S.C. § 4323(h)(1). Signed by the Honorable Charles R. Norgle, Sr on 1/10/2019. Mailed notice (lf, ) (Entered: 01/11/2019) |
| 01/18/2019 | 9 | SUPPLEMENT to motion to appear pro hac vice 5 (Crotty, Matthew) (Entered: 01/18/2019) |
| 02/05/2019 | 10 | WAIVER OF SERVICE returned executed by Eric White. United Continental Holdings, Inc. waiver sent on 1/9/2019, answer due 3/11/2019. (Romer–Friedman, Peter) (Entered: 02/05/2019) |
| 02/06/2019 | 11 | WAIVER OF SERVICE returned executed by Eric White. United Airlines, Inc. waiver sent on 1/9/2019, answer due 3/11/2019. (Romer–Friedman, Peter) (Entered: 02/06/2019) |
| 02/27/2019 | 12 | ATTORNEY Appearance for Plaintiff Eric White by Thomas Gregory Jarrard (Jarrard, Thomas) (Entered: 02/27/2019) |
| 03/11/2019 | 13 | ATTORNEY Appearance for Defendants United Airlines, Inc., United Continental Holdings, Inc. by Michael J Gray (Gray, Michael) (Entered: 03/11/2019) |
| 03/11/2019 | 14 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752–15580636. (Hall, Douglas) (Entered: 03/11/2019) |
| 03/11/2019 | 15 | ATTORNEY Appearance for Defendants United Airlines, Inc., United Continental Holdings, Inc. by Ann–Marie Woods (Woods, Ann–Marie) (Entered: 03/11/2019) |
| 03/11/2019 | 16 | ATTORNEY Appearance for Defendants United Airlines, Inc., United Continental Holdings, Inc. by Alice V. Brathwaite (Brathwaite, Alice) (Entered: 03/11/2019) |
| 03/11/2019 | 17 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Defendant United Airlines, Inc. (Gray, Michael) (Entered: 03/11/2019) |
| 03/11/2019 | 18 | MEMORANDUM by United Airlines, Inc. in support of Motion to Dismiss for Failure to State a Claim 17 (Gray, Michael) (Entered: 03/11/2019) |
| 03/11/2019 | 19 | NOTICE of Motion by Michael J Gray for presentment of Motion to Dismiss for Failure to State a Claim 17 before Honorable Charles R. Norgle Sr. on 3/15/2019 at |

| | | 10:30 AM. (Gray, Michael) (Entered: 03/11/2019) |
|---|---|---|
| 03/11/2019 | 20 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Defendant United Continental Holdings, Inc. (Gray, Michael) (Entered: 03/11/2019) |
| 03/11/2019 | 21 | MEMORANDUM by United Continental Holdings, Inc. in support of Motion to Dismiss for Failure to State a Claim 20 (Attachments: # 1 Declaration)(Gray, Michael) (Entered: 03/11/2019) |
| 03/11/2019 | 22 | NOTICE of Motion by Michael J Gray for presentment of Motion to Dismiss for Failure to State a Claim 20 before Honorable Charles R. Norgle Sr. on 3/15/2019 at 10:30 AM. (Gray, Michael) (Entered: 03/11/2019) |
| 03/14/2019 | 23 | MINUTE entry before the Honorable Charles R. Norgle: Plaintiff's response to Defendants' Motions to Dismiss 17 , 20 are due on or before 3/29/2019. Defendants' replies are due on or before 4/5/2019. The parties are not required to appear before the court on Friday, March 15, 2019. Mailed notice (ewf, ) (Entered: 03/14/2019) |
| 03/25/2019 | 24 | MOTION by Plaintiff Eric White to amend/correct *Scheduling Order (Joint)* (Romer–Friedman, Peter) (Entered: 03/25/2019) |
| 03/25/2019 | 25 | NOTICE of Motion by Peter Romer–Friedman for presentment of motion to amend/correct 24 before Honorable Charles R. Norgle Sr. on 3/29/2019 at 10:30 AM. (Romer–Friedman, Peter) (Entered: 03/25/2019) |
| 03/28/2019 | 26 | MINUTE entry before the Honorable Charles R. Norgle: Joint Motion to Amend Scheduling Order 24 is granted. The Court approves of the agreed schedule. The parties are not required to appear before the court on Friday, March 29, 2019. Mailed notice (ewf, ) (Entered: 03/28/2019) |
| 03/29/2019 | 27 | AMENDED complaint by Eric White against United Airlines, Inc., United Continental Holdings, Inc. (Romer–Friedman, Peter) (Entered: 03/29/2019) |
| 04/15/2019 | 28 | MOTION by Defendants United Airlines, Inc., United Continental Holdings, Inc. for leave to file excess pages *(Joint)* (Gray, Michael) (Entered: 04/15/2019) |
| 04/15/2019 | 29 | NOTICE of Motion by Michael J Gray for presentment of motion for leave to file excess pages 28 before Honorable Charles R. Norgle Sr. on 4/19/2019 at 10:30 AM. (Gray, Michael) (Entered: 04/15/2019) |
| 04/18/2019 | 30 | MINUTE entry before the Honorable Charles R. Norgle: Joint motion for leave to file briefs in excess of the page limit 28 is granted. The parties are not required to appear before the court on Friday, April 19, 2019. Mailed notice (ewf, ) (Entered: 04/18/2019) |
| 04/19/2019 | 31 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Defendants United Airlines, Inc., United Continental Holdings, Inc. (Gray, Michael) (Entered: 04/19/2019) |
| 04/19/2019 | 32 | MEMORANDUM by United Airlines, Inc., United Continental Holdings, Inc. in support of Motion to Dismiss for Failure to State a Claim 31 (Attachments: # 1 Declaration)(Gray, Michael) (Entered: 04/19/2019) |
| 04/19/2019 | 33 | NOTIFICATION of Affiliates pursuant to Local Rule 3.2 by United Airlines, Inc., United Continental Holdings, Inc. (Gray, Michael) (Entered: 04/19/2019) |
| 05/17/2019 | 34 | MEMORANDUM by Eric White in Opposition to Motion to Dismiss for Failure to State a Claim 31 (Romer–Friedman, Peter) (Entered: 05/17/2019) |
| 05/21/2019 | 35 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752–15850496. (Shethji, Pooja) (Entered: 05/21/2019) |
| 05/31/2019 | 36 | REPLY by Defendants United Airlines, Inc., United Continental Holdings, Inc. to Motion to Dismiss for Failure to State a Claim 31 (Gray, Michael) (Entered: 05/31/2019) |
| 05/31/2019 | 37 | ATTORNEY Appearance for Defendants United Airlines, Inc., United Continental Holdings, Inc. by Jennifer Lucia Ralph (Ralph, Jennifer) (Entered: 05/31/2019) |
| 06/04/2019 | 38 | ORDER: Motion to appear pro hac vice 35 is granted. IT IS SO ORDERED. Signed by the Honorable Charles R. Norgle, Sr on 6/4/2019. Mailed notice(pk, ) (Entered: |

| | | 06/05/2019) |
|---|---|---|
| 06/20/2019 | 39 | MOTION by Attorney Alice V. Brathwaite to withdraw as attorney for United Airlines, Inc., United Continental Holdings, Inc.. No party information provided (Woods, Ann–Marie) (Entered: 06/20/2019) |
| 06/20/2019 | 40 | NOTICE of Motion by Ann–Marie Woods for presentment of motion to withdraw as attorney 39 before Honorable Charles R. Norgle Sr. on 6/28/2019 at 10:30 AM. (Woods, Ann–Marie) (Entered: 06/20/2019) |
| 06/21/2019 | 41 | MOTION by Plaintiff Eric White for Leave to Submit Supplemental Authorities (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Romer–Friedman, Peter) (Entered: 06/21/2019) |
| 06/21/2019 | 42 | NOTICE of Motion by Peter Romer–Friedman for presentment of motion for miscellaneous relief 41 before Honorable Charles R. Norgle Sr. on 6/28/2019 at 10:30 AM. (Romer–Friedman, Peter) (Entered: 06/21/2019) |
| 06/27/2019 | 43 | MINUTE entry before the Honorable Charles R. Norgle: Motion to withdraw as attorney 39 is granted. Plaintiff's Motion for Leave to Submit Supplemental Authorities 41 is granted. Defendant may supplement their pleadings by July 24, 2019. The parties are not required to appear before the court on Friday, June 28, 2019. Attorney Alice V. Brathwaite terminated.Mailed notice (ewf, ) (Entered: 06/27/2019) |
| 07/10/2019 | 44 | ORDER: The pending motions to appear pro hac vice 5 and 14 are granted. Defendants' motions to dismiss 17 and 20 filed before Plaintiff's amended complaint are denied as moot. Defendants' operative motion to dismiss 31 is granted. The case is dismissed with prejudice. The Clerk is directed to enter judgment in favor of Defendants pursuant to Fed. R. Civ. P. 58. Signed by the Honorable Charles R. Norgle, Sr on 7/10/2019. Mailed notice(pk, ) (Entered: 07/12/2019) |
| 07/10/2019 | 45 | ENTERED JUDGMENT. Mailed notice(pk, ) (Entered: 07/12/2019) |
| 08/09/2019 | 46 | NOTICE of appeal by Eric White regarding orders 45 Filing fee $ 505, receipt number 0752–16125292. Receipt number: n (Romer–Friedman, Peter) (Entered: 08/09/2019) |
| 08/09/2019 | 47 | DOCKETING Statement by Eric White regarding notice of appeal 46 (Romer–Friedman, Peter) (Entered: 08/09/2019) |
| 08/12/2019 | 48 | NOTICE of Appeal Due letter sent to counsel of record regarding notice of appeal 46 (pk, ) (Entered: 08/12/2019) |
| 08/12/2019 | 49 | TRANSMITTED to the 7th Circuit the short record on notice of appeal 46 . Notified counsel (pk, ) (Entered: 08/12/2019) |
| 08/12/2019 | 50 | ACKNOWLEDGMENT of receipt of short record on appeal regarding notice of appeal 46 ; USCA Case No. 19–2546 (pk, ) (Entered: 08/12/2019) |
| 08/23/2019 | 51 | REQUEST for Clerk of Court to refund filing fee in the amount of $505, receipt no. 0752–16125292, (Romer–Friedman, Peter) (Entered: 08/23/2019) |
| 08/27/2019 | 52 | SEVENTH CIRCUIT transcript information sheet by Eric White (sxb, ) (Entered: 08/28/2019) |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

<table>
<tr><td>

**ERIC WHITE, on behalf of himself and all others similarly situated,**

                          **Plaintiff,**

    **v.**

**UNITED AIRLINES, INC. and UNITED CONTINENTAL HOLDINGS, INC.,**

                        **Defendants,**

</td><td>

**Case No. 19-cv-00114**

**AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

**Exempt From Filing Fees Under 38 U.S.C. § 4323(h)(1)**

</td></tr>
</table>

Plaintiff Eric White, on behalf of himself and other similarly situated individuals, by and through his attorneys, alleges as follows:

### INTRODUCTION

1.      This is a class action under the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4301 *et seq*., on behalf of current and former employees of United Continental Holdings, Inc. ("UCH") and United Airlines, Inc. ("UAL") (collectively, "Defendants" or "United"), who took short-term military leave during their employment but were not paid their normal wages or salaries by Defendants during such periods of military leave as required by USERRA, and/or did not receive credit under the United Continental Holdings, Inc. Profit Sharing Plan ("the Profit Sharing Plan" or "the Plan") for periods of military leave as required by USERRA.

2.      USERRA protects the rights of servicemembers who take leaves of absence from their civilian employers to perform qualified military service.  USERRA § 4316(b) requires military leave to be treated no less favorably than other, comparable forms of leave with respect

to the rights and benefits that employees receive during their leaves of absence. Since at least January 1, 2006, Defendants violated this provision in two ways.

3.      First, Defendants had a policy and practice of continuing to pay their employees' regular wages or salaries during certain leaves-of-absence (such as jury duty and sick leave), but not paying regular wages or salaries to employees when they take short-term military leave. By paying employees when they took jury duty leave, sick leave, and other comparable forms of non-military leave, Defendants were required by USERRA to do the same for their employees who took short-term military leave. By failing to pay wages and salaries to military service members during their short-term military leave, while continuing to pay employees their wages or salaries during periods of jury duty, sick leave, and other comparable forms of non-military leave, Defendants violated USERRA's mandate to treat military leave no less favorably than other comparable forms of non-military leave.

4.      Second, Defendants failed to credit employees' military leave for the purpose of calculating such employees' profit sharing awards under the Plan. By doing so, Defendants violated USERRA § 4318, which requires all employee pension benefit plans – like United's profit sharing plan – to treat military service as continued service for an employer. In addition, because Defendants did not give profit sharing credit to employees who took short-term military leave but gave credit for the purpose of the profit sharing plan to employees when they took comparable forms of non-military leave such as sick leave and jury duty, Defendants violated USERRA § 4316(b), which requires that employees who take military leave receive the same rights and benefits, including profit sharing, as employees who take comparable forms of non-military leave.

5.      As a result of these violations, Plaintiffs and other servicemembers employed by Defendants received less compensation than they would have received if Defendants had provided them with paid leave during periods of short-term military leave.  In addition, Plaintiff and other servicemembers who were participants in the Profit Sharing Plan received smaller profit sharing awards than they otherwise would have received if they had been paid during military leave or if the Profit Sharing Plan had credited their military leave for the purposes of calculating profit sharing awards.

6.      This action seeks a declaration that Defendants violated USERRA by failing to pay Plaintiff and members of the proposed Class during their periods of short-term military leave, a declaration that Defendants violated USERRA by failing to credit employees' short-term military leave and long-term military leave for the purpose of calculating their profit sharing awards, an order requiring Defendants to pay employees when they take short-term military leave in the future so long as Defendants provide pay to employees when they take other comparable forms of non-military leave, an order requiring Defendants to credit employees' military service for the purposes of calculating their profit sharing awards in the future, an order requiring Defendants to pay Plaintiff and members of the Class the wages or salaries they should have earned during their periods of short-term military leave since 2006, and an order requiring Defendants to recalculate and pay Plaintiff and members of the Class the profit sharing awards they received since 2006, consistent with the requirements of USERRA.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, because this action arises under USERRA, a law of the United States. This Court has subject matter jurisdiction over the USERRA claim pursuant to 38 U.S.C. § 4323(b)(3), which

provides the district courts of the United States with jurisdiction over any USERRA action brought against a private employer.

8.    Venue is proper in this District under 38 U.S.C. § 4323(c)(2), because Defendants are the private employers of Plaintiff and maintain a place of business in at least two locations in this District.  Both United Continental Holdings, Inc. and United Airlines, Inc. have their corporate headquarters at 233 S. Wacker Drive, Chicago, IL 60606.  In addition, United Airlines maintains one of its hubs at Chicago's O'Hare International Airport, where it employs thousands of employees.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to the claims in this action occurred in this District.

## PARTIES

9.    Plaintiff Eric White is and has been employed as a pilot by Defendants or their predecessor companies since 2005.  White was a pilot at Continental Airlines from 2005 to 2010, and became a United Airlines pilot in 2010, when Continental Airlines was acquired by UAL Corporation.  As part of the merger, UAL Corporation changed its name to United Continental Holdings, Inc.  White currently serves as a First Officer flying 787 passenger airplanes for United.  During his career at United, White has routinely flown to and from Chicago's O'Hare International Airport in this District.  Since 2000, White has served continuously as a pilot in the Air Force, including on active duty and on reserve duty.  During his employment with Defendants, White has routinely taken military leave, including numerous periods of short-term military leave and long-term military leave.  White resides in Ladera Ranch, California.

10.    Defendant United Continental Holdings, Inc. ("UCH") is a publicly traded company and is a holding company.  Its principal, wholly-owned subsidiary is United Airlines, Inc.  UCH is and has been incorporated under the laws of the State of Delaware since December

30, 1968.  UCH's corporate headquarters and principal executive office is located at 233 South

Wacker Drive, Chicago, Illinois 60606.  UCH is the sponsor of the Plan.  Defendant UCH is also

a private employer within the meaning of the 38 U.S.C. § 4303(4)(A), and 20 U.S.C. §

1002.5(d)(1), because, UCH has "control over employment opportunities" at its wholly-owned

subsidiary, United Airlines and because UCH subsidiaries and affiliates have delegated the

performance of employment-related responsibilities, specifically profit sharing awards, to UCH

which UCH provides through the Profit Sharing Plan.

11.    Defendant United Airlines, Inc. ("UAL") is a wholly owned subsidiary of UCH.

Defendant UAL is an employer within the meaning of 38 U.S.C. § 4303(4)(A), because it "pays

salary or wages for work performed" and has "control over employment opportunities" of its

employees, including Plaintiff.

## CLASS ACTION ALLEGATIONS

12.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure on behalf of the following Classes:

(1)    The Paid Leave Class:  Current or former employees of United Continental

Holdings, Inc., United Airlines, Inc., Continental Airlines, Inc., and/or any of their

subsidiaries or predecessors, who during their employment with any of these

entities took short-term military leave from their employment and during such

short-term military leave were not paid the wages or salary that they would have

earned had they continued to work their ordinary work schedules from January 1,

2006, through the date of judgment in this action.

(2)    The Profit Sharing Class:  Qualified Employees under the United Continental

Holdings, Inc. Profit Sharing Plan who took short-term military leave or long-

term military leave from their employment with an Employer under the Plan

during a Plan Year in which they were eligible to receive an award under the Plan

(or would have been eligible to receive an award under the Plan if their earnings

associated with their military leave had been credited), from January 1, 2006,

through the date of judgment in this action.

Excluded from the Classes are any members of the Committee who were responsible for

administering the Profit Sharing Plan, any person to whom UCH and/or the Committee delegated

authority to manage or control the administration of the Plan, and all former or current

employees who previously reached settlements with or judgments against Defendants in

USERRA actions concerning United's failure to pay wages or salaries during periods of short-

term military leave and United's failure to credit employees' military service for the purposes of

calculating profit sharing awards.

**Impracticality of Joinder**

13.     The members of the Classes are so numerous that joinder of all members of the

proposed Classes is impracticable.  According to Defendants' 2017 Annual Report, as of

December 31, 2017, Defendants employed 89,800 employees, including 11,492 pilots, 22,676

flight attendants, 13,299 passenger service employees, 13,187 fleet service employees, 9,535

technicians, 1,000 storekeeper employees, and 402 dispatchers.  According to Defendants'

website, https://united-veterans.jobs/, "United has many employees who have proudly served in

the military, and some who continue to serve in the reserve components."  And Defendants' web

site states that they actively recruit members of the military as employees.  Based on these

statements, at least several thousand former and current employees of Defendants are members

of each of the Classes.

14.     According to United's Corporate Fact Sheet, https://hub.united.com/corporate-fact-sheet/, United Airlines serves 231 airports in the United States of which six are hubs (Chicago, Denver, Houston, Los Angeles, Newark, San Francisco and Washington-Dulles), plus 125 international destinations.  Based on the varied locations of Defendants' employees, the members of the Classes are geographically dispersed across the United States, if not the world.

**Commonality**

15.     The central questions in this case, which will generate common answers, are (1) whether Defendants' policy or practice of failing to pay their employees' wages and/or salaries during periods of short-term military leave violates USERRA § 4316, and whether (2) Defendants' policy of failing to credit military service for the purposes of calculating profit sharing awards violated USERRA § 4316 and USERRA § 4318.

16.     Plaintiff's claims raise subsidiary common questions, including the following:

(a)     whether Defendants maintain a policy or practice of refusing to pay their employees when they take short-term military leave, while paying employees when they take other forms of comparable leave;

(b)     whether short-term military leave is comparable to jury duty, sick leave, and other forms of non-military leave for which Defendants have provided wages, salaries, and/or profit sharing to their employees;

(c)     whether USERRA § 4316(b) requires Defendants to provide the same rights and benefits to employees who take short-term military leave as other comparable forms of non-military leave, including pay or salaries and profit sharing awards.

(d)    whether Defendants are and were required by USERRA § 4318 to credit all military service for the purposes of calculating profit sharing awards; and

(e)    whether Defendants' violations of USERRA were willful, such that they should be required to pay liquidated damages to Plaintiff and the members of the proposed Classes.

17.    Because Defendants adopted and applied uniform policies or practices of not paying employees when they take short-term military leave and failing to credit all military service for the purposes of calculating profit sharing awards, answers to these questions will produce common answers for all members of the Class.  As Defendants acted in a uniform, systematic manner with respect to both Classes, all members of each Class suffered the same type of injury based on the same policies or practices, and resolving their claims will be based on common legal and factual questions

18.    Defendants' policy or practice of refusing to pay employees when they take short-term military leave, while paying employees when they take other comparable forms of non-military leave, was applied uniformly to the Paid Leave Class, the issues relating to the relief that Class Members should receive will be common.  Likewise, because Defendants' policy or practice of failing to credit all military service for the purposes of calculating profit sharing awards was applied uniformly to the Profit Sharing Class, the issues relating to the relief Class members should receive will be common.  To the extent that any of these policies or practices are found to violate USERRA, the determination of the amounts to be paid to members of each Class will be formulaic and can be readily calculated pursuant to a common formula.

**Typicality**

19.    Plaintiff's claims are typical of the other members of both Classes, because the claims challenge uniform policies or practices by which Defendants failed to pay employees when they take short-term military leave and failed to credit employees' military service for the purposes of calculating profit sharing awards, while paying employees and crediting their earnings when they take other, comparable forms of leave. In addition, Plaintiff and the Class Members were all injured by the same uniform policies or practices.

**Adequacy**

20.    Plaintiff will fairly and adequately protect the interests of other members of both Classes.

21.    Plaintiff does not have any conflict with any other member of either Class. Plaintiff understands his obligations as a class representative, has already undertaken steps to fulfill them, and is prepared to continue to fulfill his duties as class representative.

22.    Defendants have no unique defenses against the Plaintiff that would interfere with Plaintiff's representation of the Classes.

23.    Plaintiff is represented by counsel with significant experience in prosecuting class action litigation, including class action litigation involving rights and benefits of servicemembers under USERRA.

**Rule 23(b)(1)**

24.    This action can be maintained as a class action under Rule 23(b)(1)(A) of the Federal Rules of Civil Procedure. The central questions are whether the uniform policies or practices by which Defendants failed to pay their employees when they take short-term military leave and failing to credit military service for the purposes of calculating profit sharing awards

9

**Appx14**

violates USERRA.  As a result, prosecution of separate claims by individual members as to the legality of the same policy would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct.

25.     This action can be maintained as a class action under Rule 23(b)(1)(B) of the Federal Rules of Civil Procedure.  As a practical matter, resolution of whether Defendants were required under USERRA to pay employees when they take short-term military leave and credit military service for the purposes of calculating profit sharing awards would be dispositive of that matter for other employees even if they were not parties to this litigation and would substantially impair or impede their ability to protect their interests if they are not made parties to this litigation by being included in the Classes.

**Rule 23(b)(2)**

26.     This action can also be maintained as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure.  Defendants have acted and/or failed to act on grounds generally applicable to each Class, making declaratory and injunctive relief appropriate with respect to the Class as a whole.

27.     Defendants maintained uniform policies or practices as to all members of each Class.  Defendants are alleged to have violated USERRA by refusing to pay employees when they take short-term military leave and/or failing to credit employees' military service for the purposes of calculating profit sharing awards.  As such, Defendants have acted or refused to act on grounds that apply generally to the Class.  As a result, final declaratory and injunctive relief is appropriate respecting the Class as a whole.

28.     The relief sought consists primarily of (a) a declaration establishing that Defendants have violated USERRA by failing to pay employees when they take short-term

**Appx15**

military leave and failing to credit military service for the purposes of calculating profit sharing awards, (b) an order requiring Defendants to pay the Paid Leave Class Members the wages or salaries that they should have received during their periods of short-term military leave, consistent with USERRA, and (c) an order requiring Defendants to recalculate and pay the Profit Sharing Class Members the profit sharing awards they would have received had their military leave been credited. The monetary relief sought either flows from and/or is incidental to the declaratory relief sought, as it flows directly from the ordering of such declaratory relief and can be calculated in a simple, objective, and mechanical manner. Specifically, the amount owed to the Class Members can be calculated by identifying the wages or salaries the Class Members would have received during their periods of short-term military leave, and by identifying the profit sharing awards they would have received had their military leave been credited.

**Rule 23(b)(3)**

29.     This action can also be maintained as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure, because the questions of law and fact common to the members of the Class predominate over questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient resolution of this controversy.

30.     The common questions of law and fact concern whether Defendants' policies or practices of failing to pay employees when they take short-term military leave and failing to credit military service for the purposes of calculating profit sharing awards violated USERRA. As the Class Members were all employees of Defendants who took military leave and had their compensation or profit sharing reduced by Defendants' violations, common questions related to Defendants' liability will necessarily predominate over any individual questions.

**Appx16**

31.     Because the calculation of Class Members' wages and/or salaries during periods of short-term military leave and proper profit sharing awards can be readily calculated based on their wage and/or salary rates and the relevant profit sharing award calculations, and because the relief primarily consists of a declaration and an order requiring Defendants to pay the Class Members the wages or salaries they are owed and/or the profit sharing awards they are owed consistent with USERRA, common questions as to remedies will predominate over any individual issues.

32.     A class action is superior to other available methods for the fair and efficient resolution of this controversy.  By resolving the common issues in a single class proceeding, the issues will be efficiently resolved in a single proceeding rather than multiple proceedings.  Class certification is a superior method of proceeding here, because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about Defendants' obligations under USERRA and of the remedy that should be provided under USERRA.

33.     Additional factors set forth in Rule 23(b)(3) also support certification.

(a)     The members of each Class have an interest in a unitary adjudication of the issues presented in this action for the same reasons why this case should be certified under Rule 23(b)(1).  Additionally, many members of the Classes are unlikely to have sufficient damages to justify pursuing an individual action in federal court or obtain counsel to pursue an individual action.  But all Class Members would benefit from a class action that obtains relief for all members of the Classes.

(b)     No other litigation concerning claims that Defendants should have paid their employees when they take short-term military leave or that Defendants

**Appx17**

should have credited employees' military leave for the purposes of calculating

profit sharing awards has been filed by any other members of the Classes.

(c)    This is an appropriate forum for these claims because, among other

reasons, jurisdiction and venue are proper, Chicago is the corporate headquarters

for both Defendants.  As Chicago O'Hare Airport is a hub for United Airlines and

one of its busiest hubs by departures and arrivals, a significant portion of the

Classes work and/or reside in this District.

(d)    There are no difficulties in managing this case as a class action.

## FACTUAL ALLEGATIONS

### Defendants' Policy Regarding Military Leave

34.    When an employee of Defendants is required to be absent from his or her

employment for one of a number of reasons (unrelated to military leave), including that the

employee is required to perform jury service or has fallen ill, Defendants continue to pay the

employee's wages and/or salary during his or her absence from work.  However, Defendants do

not continue to pay an employee's wages and/or salary when the employee takes short-term

military leave (i.e., military leave that lasts no more than 30 days).

35.    Since at least 2010, and upon information and belief since January 1, 2006,

Defendants have maintained a policy or practice of refusing to pay employees their wages or

salaries when they take short-term military leave, while continuing to pay employees their wages

or salaries when they take other comparable forms of non-military leave, such as jury duty and

sick leave.

13

**Appx18**

**Defendants' Control and Roles In Setting Policy Regarding Wages & Benefits**

36.    UAL is and has been a party to, and is and has been bound by, collective bargaining agreements ("CBAs") that cover the vast majority of employees of UAL and/or Continental Airlines, Inc., including a significant number of the members of the Classes.  For the employees covered by those CBAs, these CBAs establish the wages, benefits, and other terms and conditions of employment for employees, including the wages and benefits of employees when they take short-term and long-term military leave, jury duty leave, and sick leave.

37.    The primary high-level executives of UCH and of UAL have exercised control over the wages and benefits of the employees of UAL and Continental Airlines, Inc. and over the collective bargaining negotiations that set such wages and benefits, including because the UCH executives responsible for such negotiations and execution of such CBAs have had the same positions and roles at both UCH and UAL and/or Continental Airlines, Inc.  For example, UCH and UAL have the same Chief Executive Officer (Oscar Munoz), President (J. Scott Kirby), Executive Vice President and Chief Commercial Officer (Andrew Nocella), Executive Vice President for Human Resources and Labor Relations (Kate Gebo), Executive Vice President and Chief Administrative Officer and General Counsel (Brett Hart), Executive Vice President and Chief Operations Officer (Gregory Hart), and Vice President and Controller (Christopher Kenny), each of whom serves in the same role and function at both UCH and UAL.

38.    The high-level executives who negotiated and/or executed the CBAs with the unions that represent the employees at UAL and Continental Airlines, Inc. have concurrently served as labor relations executives of UCH, UAL, and/or Continental Airlines, Inc.  Executives with high-level or officer positions at UCH signed the CBAs for the following employee groups: Flight Attendants, Fleet Service, Passenger Service, Pilots, Technicians and Related & Flight

**Appx19**

Simulator Technicians, Storekeeper Employees, Fleet Tech Instructors, Load Planners, Security Officers, and Maintenance Instructors.  By having its high-level executives negotiate and sign the CBAs that cover the employees of UAL and Continental Airlines, Inc., both UCH and UAL had the authority to determine and did determine the terms of employees' wages and benefits, including whether to provide employees their regular wages or salaries when they took short-term military leave, jury duty leave, or sick leave.  Through those negotiations by its high-level executives, UCH made the decision not to pay regular wages or salaries of employees who take short-term military leave while providing regular wages or salaries to employees who take jury duty leave or sick leave.

39.    In connection with the collective bargaining agreement ("CBA") between United Airlines, Inc. and the Air Line Pilots Association International, the union that represents the pilots of United Airlines, Inc.—the CBA that that applies to Plaintiff White's wages, benefits, and other terms of employment—Defendant UCH agreed that it is an Affiliate of UAL and that it is bound by Section 1 of the Agreement in the same manner as UAL.  By doing so, Defendant UCH has acknowledged that it has control over the wages, benefits, and terms of employment of at least the employees of United Airlines, Inc. and/or Continental Airlines, Inc. who are covered by this CBA.

40.    The First Amendment to the UCH Profit Sharing Plan, which is attached to the Declaration of Lincoln Lounsberry (ECF No. 21-1 in this action) further evidences UCH's role in negotiating the wages and benefits of UAL employees.  The First Amendment sets forth that "the Company [defined as UCH in the Amendment] *has reached joint collective bargaining agreements and certain other agreements with various represented employee groups*, necessitating certain changes to [the terms of the Plan]." (emphasis added).

41.    The Declaration of Lincoln Lounsberry (ECF No. 21-1) also illustrates that UCH and UAL have overlapping control over wages and benefits that are not negotiated with the unions.  In his declaration, Lounsberry recites that he is an employee of UAL in its Senior Managing Counsel – Benefits.  Even though he is apparently only an employee of UAL and not UCH, he was responsible for drafting and amending the Profit Sharing Plan sponsored by UCH and advising "the company" as to its administration.  As the Profit Sharing Plan provides that UCH has responsibility for administration under the terms of the Profit Sharing Plan, "the company" must at least mean UCH, if not also UAL.

42.    As a party to and by negotiating the employees' CBAs and other agreements covering employees at UAL and Continental Airlines, Inc. and by jointly setting the terms of non-negotiated wages, benefits, and other terms of employment for non-union employees, UCH and UAL through its overlapping high-level executives and officers had the authority to determine and, in fact, did determine whether to provide employees their regular wages or salaries when they took short-term military leave, jury duty leave, or sick leave.

## USERRA Required Defendants to Pay Employees Who Took Short-Term Military Leave, Because They Paid Employees Who Took Other Comparable Forms of Non-Military Leave

43.    USERRA § 4316(b) provides in relevant part that "a person who is absent from a position of employment by reason of service in the uniformed services shall be"

(A) deemed to be on furlough or leave of absence while performing such service; and

(B) entitled to such other rights and benefits not determined by seniority as are generally provided by the employer of the person to employees having similar seniority, status, and pay who are on furlough or leave of absence under a contract, agreement, policy, practice, or plan in effect at the commencement of such service or established while such person performs such service.

38 U.S.C. § 4316(b)(1).

**Appx21**

44.     Accordingly, if an employer provides non-seniority rights and benefits to similarly situated employees, including compensation, USERRA § 4316(b) requires the employer to provide the same rights and benefits to employees during their military leave. *See id*.; 20 C.F.R. § 1002.150(a).

45.     As the USERRA regulations explain, the "most significant factor to compare" two types of leave to determine if they are a "comparable form of leave" is "the duration of the leave."  20 C.F.R. § 1002.150(b).  "[O]ther factors such as the purpose of the leave and the ability of the employee to choose when to take the leave should also be considered." *Id*.

46.     Pursuant to their policy and practice of refusing to pay employees their regular wages or salaries during periods of short-term military leave, Defendants failed to pay Plaintiff and the Class Members their regular wages or salaries during each period in which they took short-term military leave.

47.     Upon information and belief, since January 1, 2006, Defendants paid their employees their regular wages or salaries while they were on leave from their employment because of jury duty and sick leave.

48.     Jury duty and sick leave are comparable to short-term military leave in terms of the duration of these forms of leave and in terms of the involuntary nature of the leave.

49.     For Defendants' employees, the duration of jury duty and sick leave is comparable to the duration of short-term military leave.  Each of these types of leaves commonly lasts several days, and usually not more than a couple of weeks.

50.     Like jury duty and sick leave, short-term military leave is ordinarily involuntary. Jury duty is required by federal, state, or local law.  Sick leave occurs due to a short-term, involuntary medical condition that prevents the employee from working.  And short-term

**Appx22**

military leave occurs due to an employee-servicemember's obligation to perform military service in the Armed Forces.

51.    In addition, the purpose of jury duty is the same as short-term military leave: to perform service for our government and engage in public service for the benefit of our society.

52.    Defendants' policy or practice of refusing to pay employees their wages or salaries when they take short-term military leave, and continuing to pay employees their wages or salaries when they take other comparable forms of non-military leave violates USERRA § 4316(b), because it denies Defendants' employees a non-seniority right or benefit that is provided to similarly situated employees who are on furlough or leave of absence.  38 U.S.C. § 4316(b).

53.    This policy or practice has unlawfully denied Defendants' employees the wages or salaries that they should have received when they engaged in short-term military leave compared to employees who received wages or salaries when they engaged in jury duty, sick leave, or other comparable forms of non-military leave.

**United's Profit Sharing Plan Credits Employees' Non-Military Leave in Making Profit Sharing Awards But Fails to Credit Employees' Comparable Military Leave**

54.    Defendant UCH sponsors the United Continental Holdings, Inc. Profit Sharing Plan ("the Plan") for the benefit of employees of UAL, Continental Airlines, and other Affiliates in which Defendant UCH owns or controls at least an 80% interest.

55.    Many of the terms of the Plan are and have been since January 1, 2016 been set forth in a written document entitled the "United Continental Holdings, Inc. Profit Sharing Plan Amended and Restated Effective January 1, 2016," which is referred to as "the Plan" but for purposes of clarity will be referred to as the 2016 Plan Document.  According to Section VI.C of the 2016 Plan Document, other terms of the Plan are set forth in the Plan Rules, Plan

Administration and collective bargaining agreements.  Plaintiff has not been provided with a

written copy of the Plan Rules or Plan Administration.

56.     The Plan commenced on January 1, 2006, as the UAL Corporation Success

Sharing Program – Profit Sharing Plan, and was amended effective January 1, 2011 and on

January 1, 2014.  Upon information and belief, the relevant terms of the Plan have not materially

changed since 2006.

57.     Section I.A. of the 2016 Plan Document sets forth the "Purpose" of the Plan,

which explains that UCH sponsors the Plan "for benefit of certain employees of United Air

Lines, Inc., Continental Airlines, Inc. and other participating Affiliates."

58.     Section I.B. of the Plan Document that with respect to "employees covered by a

collective bargaining agreement with the Employer (including UAL) pursuant to which the

Employer has agreed to provide" such employees "with participation in a profit sharing bonus

plan, this Plan is maintained pursuant to [the collective bargaining] agreement." Section 1.E

further provides that that with respect to the "employees covered by a collective bargaining

agreement with the Employer" the Plan is "subject to termination pursuant to the terms of the

collective bargaining agreement."  These provisions explain that the Employers (*i.e.*, UAL and

Continental Airlines, Inc. and other Affiliates) have delegated to UCH the responsibility to

provide profit sharing benefits that these Employers are contractually obligated to provide

pursuant to the CBAs.  To fulfill that delegated obligation, UCH established, maintains and

administers this Profit Sharing Plan, and its Sponsor, UCH, the authority to and role of managing

employees' profit sharing benefits.

59.     Section IV.A of the 2016 Plan Document provides that Defendant UCH or its

delegate and as to certain matters, the Compensation Committee of the Board of Directors of

UCH (or another committee appointed by the Board of UCH), has authority and responsibility to manage and control the administration of the Plan.

60.    Pursuant to Section III.C.5 of the 2016 Plan Document, UCH has delegated the authority to determine – other than those items specifically listed on Appendix A – whether an item of compensation is included or excluded from the definition of Wages under the Plan to the UCH Executive Vice President – Human Resources and Labor Relations.  From at least December 2010 through December 2017, the Executive Vice President – Human Resources and Labor Relations was Michael P. Bonds. Based on the First Amendment to the Plan, which was signed by Kate Gebo as UCH Executive Vice President – Human Resources and Labor Relations, Gebo succeeded Bonds as UCH Executive Vice President – Human Resources and Labor Relations.

61.    Pursuant to Section I.C and I.F of the 2016 Plan Document, Qualified Employees *(i.e.*, those employees who are qualified to receive profit sharing under the Plan) are Domestic Employees, which means any regular full-time or part-time U.S. employee (and certain international based employees) of United Airlines, Inc., Continental Airlines, Inc., Continental Micronesia, Mileage Plus, Inc., and several other Affiliates in which UCH owns or controls a greater than 80% interest, who have completed a year of service as of December 31 of the year for which profit sharing is awarded.

62.    Section V.A. of the Plan Document provides that "[t]he Plan may at any time be amended, modified, suspended or terminated, as [Defendant UCH] in its sole discretion determines."

63.    Sections III.A and III.B of the 2016 Plan Document provide that if Defendant UCH's pre-tax Profit for a certain year exceeds a threshold—which in the 2016 Plan Document

is $10 million—then Defendant UCH will make profit sharing awards to eligible employees based on a formula that takes into account the "Wages" each employee earned during that year in relation to the total "Wages" of all eligible employees, as well as the employee's occupation or labor group. For example, pilots and flight attendants' Wages are given twice as much weight or credit as the Wages of customer service employees or storekeeper employees.

64.    Section III.C of the 2016 Plan Document sets forth what compensation is included in the term "Wages," and Appendix A-1 sets forth a list of certain compensation that is specifically included in the definition of "Wages" under the Plan.  Appendix A-2 sets forth a list of certain compensation that is specifically excluded from the definition of "Wages" under the Plan. While neither jury duty nor military leave is specifically addressed in the 2016 Plan Document, given the longstanding practice by UCH of crediting jury duty leave as "Wages" under the Plan (and paying employees who take jury duty), but not crediting military leave, and based on the procedures and practices of UCH, the practices under the Plan constitute UCH policy since at least 2006.

65.    Pursuant to Section III.C.1 and III.C.2 of the Plan and Appendix A, Wages under the Plan include the compensation that employees receive when they take non-military leaves of absence such as sick leave and other circumstances in which they are not working, such as holidays and vacation.  Appendix A does not mention either compensation for jury duty leave or the compensation that employees would have earned had they not taken military leave.

66.    Pursuant to the formula under the Plan (as set forth in Section III), the higher amount of Wages that a Qualified Employee receives credit for under the Plan, the higher his or her profit sharing award will be in a year in which profit sharing awards are made, and the higher

his or her share of all employees' profit sharing awards will be, regardless of the employee's occupation or labor group.

67.     From the inception of the Plan to the present, the Plan has not credited employees' military service when determining the Wages of Qualified Employees who take military leave for the purposes of calculating profit sharing awards. As a result, Qualified Employees who have taken military leave from Defendants have been denied credit for all of their military service when profit sharing awards under the Plan have been calculated and paid since 2006.  In addition, because Defendants have not paid employees who took short-term military leave when they paid employees to took comparable forms of non-military leave, as required by USERRA § 4316(b), Qualified Employees were not credited any Wages for the purpose of calculating their profit sharing awards when they took short-term military leave.

68.     Other major airlines in the United States, such as Southwest Airlines and Delta Airlines, credit employees' military leave for the purposes of calculating their employees' profit sharing awards.

69.     Pursuant to Section III.D. of the 2016 Plan Document, Qualified Employees receive profit sharing awards no later than March 15 or as soon as practicable thereafter following a year in which qualified employees are entitled to receive profit sharing awards.

70.     Pursuant to Section III.E. of the 2016 Plan Document, Qualified Employees who receive profit sharing awards may elect to receive a cash payment or contribute their profit sharing award into an employer-sponsored 401(k) plan in which the employee is eligible to participate.

71.     Qualified Employees received profit sharing awards for the following years: 2006, 2010, 2011, 2012, 2013, 2014, 2015, 2016, and 2017.  Qualified Employees who took

military leave during these years would have received greater profit sharing awards in such years if their military leave been credited for the purposes of calculating their profit sharing awards.

**Plaintiff's USERRA-Protected Military Leave & Awards Under the Plan**

72. Since his employment with Defendants began in 2005, Plaintiff took dozens of periods of short-term military leave of 30 days or less that qualified as service in the uniformed services within the meaning of USERRA, 38 U.S.C. § 4303(13), including in the following years: 2006, 2007, 2010, 2011, 2012, 2013, 20414, 2015, 2016, 2017, and 2018. In addition, Plaintiff took a number of long term periods of military leave since 2005.

73. For the times that Plaintiff took military leave, including short-term military leave, Defendants did not pay Plaintiff his regular wages.

74. For the times that Plaintiff took short-term military leave and long-term military leave, Defendants did not credit any of Plaintiff's periods of military leave in calculating his profit sharing awards in the years in which he and other employees received profit sharing awards.

75. Plaintiff was a Qualified Employee in the Plan and received a profit sharing award in 2011, 2012, 2013, 2014, 2015, 2016, and 2017. Had Plaintiff's military leave, including short-term military leave, had been credited for the purposes of calculating his profit sharing award, Plaintiff's profit sharing award would have been greater than it was in such years.

## COUNT I
### VIOLATION OF USERRA, 38 U.S.C. § 4316(b)(1), AGAINST DEFENDANTS
### (For Failure to Pay Wages or Salaries During Periods of Short-Term Military Leave)
### On Behalf of the Paid Leave Class

76.    Plaintiff hereby repeats and incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

77.    USERRA, 38 U.S.C. § 4316(b)(1), provides that "a person who is absent from a position of employment by reason of service in the uniformed services shall be (A) deemed to be on furlough or leave of absence while performing such service; and (B) entitled to such other rights and benefits not determined by seniority as are generally provided by the employer of the person to employees having similar seniority, status, and pay who are on furlough or leave of absence under a contract, agreement, policy, practice, or plan in effect at the commencement of such service or established while such person performs such service."

78.    The U.S. Department of Labor's regulations, which implement and interpret USERRA § 4316(b)(1), provide that "[i]f the non-seniority benefits to which employees on furlough or leave of absence are entitled vary according to the type of leave, the employee must be given the most favorable treatment accorded to any comparable form of leave when he or she performs service in the uniformed services." 20 C.F.R. § 1002.150(b). Under these regulations, the "duration of leave" "may be the most significant factor" to determine whether two forms of leave are comparable, and other relevant factors include "the purpose of the leave and the ability of the employee to choose when to take the leave." *Id.*

79.    As described above, Defendants have maintained a policy or practice of failing to pay employees their wages or salaries when they take short-term military leave, while continuing to pay employees their wages or salaries when they take other comparable forms of non-military leave, such as jury duty and sick leave.

80. As described above, jury duty leave and sick leave are comparable to short-term military leave in terms of the duration, purpose, and/or the ability of the employee to determine whether to take the leave.

81. By adopting and applying a policy or practice of failing to pay the Paid Leave Class Members when they take short-term military leave, Defendants denied Plaintiff and the Paid Leave Class Members the same rights and benefits, including compensation, that Defendants provided to employees who took comparable forms of non-military leave, including jury duty leave and sick leave, and thus failed to provide the Paid Leave Class Members the most favorable treatment accorded to employees who took other comparable forms of non-military leave. By doing so, Defendants violated and continues to violate USERRA § 4316(b)(1).

82. Due to Defendants' failure to comply with USERRA § 4316(b)(1), Plaintiff and other members of the Paid Leave Class received lower wages, salaries, and/or compensation than they would have received had Defendants complied with USERRA and the Department of Labor's implementing regulations.

83. Upon information and belief, Defendants' violation of USERRA § 4316(b)(1) was willful. Accordingly, Defendants should be required to pay liquidated damages pursuant to 38 U.S.C. § 4323(d)(1)(C).

## COUNT II
**VIOLATION OF USERRA, 38 U.S.C. § 4316(b)(1), AGAINST DEFENDANTS**
**(For Failure to Credit Short-Term Military Leave in Calculating Profit Sharing Awards)**
**On Behalf of the Profit Sharing Class**

84. Plaintiff hereby repeats and incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

85. USERRA, 38 U.S.C. § 4316(b)(1), provides that "a person who is absent from a position of employment by reason of service in the uniformed services shall be (A) deemed to be

**Appx30**

on furlough or leave of absence while performing such service; and (B) entitled to such other rights and benefits not determined by seniority as are generally provided by the employer of the person to employees having similar seniority, status, and pay who are on furlough or leave of absence under a contract, agreement, policy, practice, or plan in effect at the commencement of such service or established while such person performs such service."

86.     The U.S. Department of Labor's regulations, which implement and interpret USERRA § 4316(b)(1), provide that "[i]f the non-seniority benefits to which employees on furlough or leave of absence are entitled vary according to the type of leave, the employee must be given the most favorable treatment accorded to any comparable form of leave when he or she performs service in the uniformed services."  20 C.F.R. § 1002.150(b).  Under the Regulations, the "duration of leave" "may be the most significant factor" to determine whether two forms of leave are comparable, and other relevant factors include "the purpose of the leave and the ability of the employee to choose when to take the leave."  20 C.F.R. § 1002.150(b).

87.     As described above, Defendants UCH and UAL have maintained a policy or practice of failing to credit employees' short-term military leave when calculating their profit sharing awards, while crediting employees' comparable forms of non-military leave, such as jury duty and sick leave, when calculating their profit sharing awards.

88.     As described above, jury duty leave and sick leave are comparable to short term military leave in terms of the duration, purpose, and/or the ability of the employee to determine whether to take the leave.

89.     By adopting and applying a policy or practice of failing to credit employees' short-term military leave when calculating their profit sharing awards while crediting employees' comparable forms of non-military leave, such as jury duty and sick leave, when calculating their

**Appx31**

profit sharing awards, Defendants failed to provide Plaintiff and the Profit Sharing Class

Members who took short-term military leave the most favorable treatment accorded to

employees who took other comparable forms of non-military leave.  By doing so, Defendants

violated and continues to violate USERRA § 4316(b)(1).

90.    Due to Defendants' failure to comply with USERRA § 4316(b)(1), Plaintiff and

other members of the Profit Sharing Class received lower profit sharing awards than they would

have received had Defendants complied with USERRA and the Department of Labor's

implementing regulations.

91.    Upon information and belief, Defendants' violation of USERRA § 4316(b)(1)

was willful.  Accordingly, Defendants should be required to pay liquidated damages pursuant to

38 U.S.C. § 4323(d)(1)(C).

### <u>COUNT III</u>
### VIOLATION OF USERRA, 38 U.S.C. § 4318, AGAINST DEFENDANTS
**(For Failure to Credit All Military Leave in Calculating Profit Sharing Awards)**
**On Behalf of the Profit Sharing Class**

92.    Plaintiff hereby repeats and incorporates the allegations contained in the

foregoing paragraphs as if fully set forth herein.

93.    USERRA § 4318 applies to both ERISA plans and non-ERISA plans.  USERRA

§ 4318(a)(1)(A) provides that USERRA applies to "an employee pension benefit plan," which

includes a pension plan under ERISA § 3(2), 29 U.S.C. § 1002(2), but also expressly states that §

4318 applies to pension plans that are not covered by ERISA.

94.    The Department of Labor's regulations, 20 C.F.R. § 1002.260(a), likewise explain

that while all ERISA-covered pension plans are covered by USERRA, "USERRA covers certain

pension plans not covered by ERISA."

95.     Section I.C. of the 2016 Plan Document asserts that the Plan "is not intended to be

. . . an employee benefit plan within the meaning of ERISA."  Not only is a statement of whether

a Plan is intended to be covered by ERISA irrelevant to whether a plan is covered by ERISA, but

nothing in the 2016 Plan attempts to disclaim coverage as a pension plan under USERRA §

4318.

96.     The Plan is an employee benefit pension plan under USERRA, 38 U.S.C. § 4318,

because, among other things, the Plan permits employees to designate an amount of their profit

sharing awards that will be paid to their retirement plans and thereby defer their profit sharing

awards until the termination of their employment and/or have the awards paid as retirement

income.

97.     Under USERRA § 4318(a)(2)(B), an employee's service in the uniformed service

will be deemed to constitute service with the employer for purposes of determining the accrual of

benefits under a pension plan.

98.     The Department of Labor's regulations require that "[o]n reemployment,

the employee [be] treated as not having a break in service with the employer or the employers

maintaining a pension plan, for purposes of participation, vesting and accrual of benefits, by

reason of the period of absence from employment due to or necessitated by service in the

uniformed services."  20 C.F.R. § 1002.259.

99.     Pursuant to USERRA, 38 U.S.C. § 4318(b)(1), an employer reemploying a person

after a period of service in the uniformed services is liable to the employee benefit pension plan

for funding any obligation of the plan to provide benefits, including those accrued under

USERRA § 4318(a)(2)(B).

100.    For the purposes of computing an employer's liability under USERRA 38 U.S.C. § 4318(b), the employee's compensation during the period of service described in § 4318 (a)(2)(B) shall be computed either (A) at the rate the employee would have received but for the period of service described in Section 4318(a)(2)(B), or (B) in the case that the determination of such rate is not reasonably certain, on the basis of the employee's average rate of compensation during the 12-month period immediately preceding such period (or, if shorter, the period of employment immediately preceding such period).

101.    Defendants adopted a policy that did not treat any service of employees who took leave in the uniformed service as service with an Employer under the Plan.

102.    By failing to treat the service of employees who took short-term miltiary leave or long-term military leave as service under the Plan, Defendants UCH and UAL violated and continue to violate USERRA § 4318.

103.    As a result of Defendants UCH and UAL's failure to comply with USERRA § 4318, Plaintiff and other members of the Profit Sharing Class received profit sharing awards that were smaller than what they would have received had Defendants complied with USERRA.  In addition, Plaintiff and other members of the Profit Sharing Class were unable to use the profit sharing awards that should have been allocated to them to contribute those awards into their tax-qualified retirement plans.

104.    Upon information and belief, Defendants' violation of USERRA § 4318 was willful.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and respectfully requests that this Court award the following relief:

A.      Declare that Defendants' policies or practices of failing to pay their employees' regular wages, salaries, or compensation during periods of short-term military leave, while providing pay to employees when they took other comparable forms of non-military leave, and failing to credit employees' short-term military leave for the purposes of calculating profit sharing awards, while crediting employees' comparable forms of non-military leave, violated the rights of Plaintiff and the Class under USERRA § 4316(b);

B.      Declare that Defendants' failure to credit employees' short-term military leave and long-term military leave for the purposes of calculating profit sharing awards violated USERRA § 4318.

C.      Declare that Defendants' violations of USERRA were willful under 38 U.S.C. § 4323(d)(1)(C).

D.      Declare that Defendants must pay their employees' regular compensation during periods of short-term military leave and credit employees' periods of short-term military leave for the purposes of calculating profit sharing awards.

E.      Require Defendants to comply with USERRA § 4316 by paying Plaintiff and the Class Members their regular wages, salaries, and/or compensation during periods of short-term military leave in the future, and crediting employees' periods of short-term military leave for the purposes of calculating profit sharing awards in the future.

F.      Require Defendants to comply with USERRA § 4318 by crediting all periods of military leave for the purposes of calculating profit sharing awards in the future.

G.      Require Defendants to pay Plaintiff and the Class Members the wages, salaries, and/or compensation they should have received for periods of short-term military leave in accordance with the Court's declaration, or at a minimum to pay Plaintiff and the Class Members

the difference between the wages, salaries, and/or compensation they should have received for periods of short-term military leave and the payments that Plaintiff and the Class Members received from the Armed Forces for their military service during such short-term military leave periods.

H.    Require Defendants to recalculate the profit sharing awards that Plaintiff and the Class Members should have received under the Plan in accordance with the Court's declaration;

I.    Order Defendants to pay all members of the Class liquidated damages in an amount to be determined at trial, 38 U.S.C. § 4323(d)(1)(C).

J.    Award pre-judgment and post-judgment interest on any monetary relief awarded or required by order of this Court.

K.    Require Defendants to pay attorneys' fees, expert witness fees, litigation expenses and costs pursuant to 38 U.S.C. § 4323(h) and/or order the payment of reasonable fees and expenses in this action to Plaintiff's Counsel based on the common benefit and/or common fund doctrine out of any money or benefit recovered for the Class in this Action.

L.    Grant such other and further relief as the Court deems proper, just and/or equitable.

## **JURY TRIAL DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure or any similar rule or law, Plaintiff demands a trial by jury for all causes of action and issues for which trial by jury is available.

Dated: March 29, 2019                    Respectfully submitted,

                                         */ s / Peter Romer-Friedman*
                                         Peter Romer-Friedman (Admitted to N.D. Ill.)
                                         Outten & Golden LLP
                                         601 Massachusetts Avenue NW
                                         Second Floor West
                                         Washington, DC 20001
                                         Tel: (202) 847-4400
                                         Email: prf@outtengolden.com

                                         Paul W. Mollica (Admitted to N.D. Ill.)
                                         Outten & Golden LLP
                                         161 North Clark Street
                                         Suite 1600
                                         Chicago, IL 60601
                                         Tel: (312) 809-7010
                                         Email: pwmollica@outtengolden.com

                                         R. Joseph Barton (Admitted to N.D. Ill.)
                                         Block & Leviton LLP
                                         1735 20th Street NW
                                         Washington, DC 20009
                                         Tel: (202) 734-7046
                                         Fax: (617) 507-6020
                                         Email: jbarton@blockesq.com

                                         Thomas G. Jarrard (Admitted to N.D. Ill.*)*
                                         Law Office of Thomas G. Jarrard LLC
                                         1020 N. Washington Street
                                         Spokane, WA 99201
                                         Tel: (425) 239-7290
                                         Fax: (509) 326-2932
                                         Email: tjarrard@att.net

                                         Matthew Z. Crotty (*Pro hac vice* motion pending)
                                         Crotty & Son Law Firm, PLLC
                                         905 W. Riverside Avenue
                                         Suite 404
                                         Spokane, WA 99201
                                         Tel: (509) 850-7011
                                         Email: matt@crottyandson.com

                                         *Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I, Peter Romer-Friedman, an attorney, hereby certify that on March 29, 2019, I filed the

foregoing *Amended Class Action Complaint* via the Court's CM/ECF system, which

caused a copy of the same to be served upon all counsel of record via ECF.


*/s/ Peter Romer-Friedman*
Peter Romer-Friedman

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **ERIC WHITE, on behalf of himself and all others similarly situated,** ) | |
| ) | Case No. 1:19-CV-00114 |
| **Plaintiff,** ) | |
| ) | Honorable Judge Charles Norgle |
| **v.** ) | |
| ) | |
| **UNITED AIRLINES, INC. and UNITED CONTINENTAL HOLDINGS, INC.,** ) | |
| ) | |
| **Defendants.** ) | |

**DECLARATION OF LINCOLN LOUNSBURY IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

I, Lincoln Lounsbury, declare as follows:

1.     My name is Lincoln Lounsbury. I am over the age of 18 and am otherwise competent to make this declaration.

2.     All statements in this declaration are true and accurate. The following statements are based on my personal knowledge and review of company records and other documents that are maintained in the regular course and as part of the regular business practices of United Airlines, Inc. ("United") and United Continental Holdings, Inc. ("UCH").

3.     I am currently employed by United in its Legal Department as Senior Managing Counsel - Benefits. I have held this position since August 28, 2006.

4.     My primary responsibilities are to provide legal advice and work product with respect to benefits, compensation, and bonus plans applicable to United's employees. This work includes drafting and amending the United Continental Holdings, Inc. Profit Sharing Plan and advising United with respect to its administration. In that position, I also have familiarity with the collective bargaining agreements applicable to United's employees, including our pilots.

5.  Attached as **Exhibit A** is a true and accurate copy of the United Continental Holdings, Inc. Profit Sharing Plan (Amended and Restated Effective January 1, 2016).

6.  Attached as **Exhibit B** is a true and accurate copy of excerpts from the current collective bargaining agreement between United and the Air Line Pilots Association, International, the union that represents United's pilots.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on

_APRIL 18_ , 2019 in _CHICAGO_ , _ILLINOIS_.

Lincoln Lounsbury

**Appx40**

# EXHIBIT A

Pages: 103

Filed: 04/17/2020

Document: 32

Case: 19-2546

# UNITED CONTINENTAL HOLDINGS, INC.
# PROFIT SHARING PLAN

**(Amended and Restated Effective January 1, 2016,
Except As Otherwise Provided Herein)**

## I.  General

A.  *Purpose.*  United Continental Holdings, Inc. (the "Company") sponsors this United Continental Holdings, Inc. Profit Sharing Plan (the "Plan") for the benefit of certain employees of United Air Lines, Inc., Continental Airlines, Inc., and other participating Affiliates.

B.  *Collective Bargaining.*  As it relates to Qualified Employees who are in the class or craft of employees covered by a collective bargaining agreement with the Employer pursuant to which the Employer has agreed to provide such Qualified Employees with participation in a profit sharing bonus plan, this Plan is maintained pursuant to such agreement.

C.  *Cash Bonus Plan.*  The Plan is a cash bonus plan and is not intended to be (and will not be construed or administered as) an employee benefit plan within the meaning of ERISA. The Plan is intended to be a discretionary cash bonus plan and payments under the Plan will not constitute a part of an employee's regular rate of pay for any purpose; provided, however, all Awards will be paid to Qualified Employees in accordance with the terms of the Plan and the applicable collective bargaining agreements.  Except to the extent specifically provided under a particular pension, insurance, profit sharing, retirement, welfare or other employee benefit plan or arrangement maintained or contributed to by the Company or an Affiliate, the payments to an employee under the Plan will not be treated as "salary," "wages," or "cash compensation" to the employee for the purpose of computing benefits to which the employee may be entitled under any such plan or arrangement.

D.  *Effective Date.*  The Plan commenced on January 1, 2006 as the UAL Corporation Success Sharing Program – Profit Sharing Plan, was previously amended and restated effective January 1, 2011, and again effective January 1, 2014, and is hereby amended and restated effective January 1, 2016, to incorporate the requirements of certain collective bargaining agreements.  This amendment and restatement is effective for the 2016 Plan Year and future Plan Years, except as otherwise stated herein, and does not apply to 2015 Plan Year profit sharing payments made in 2016.

E.  *Term.*  The provisions of the Plan shall continue indefinitely subject to termination by the Company, or, as it relates to any Qualified Employees who are in the class or craft of employees covered by a collective bargaining agreement with the Employer pursuant to which the Employer has agreed to provide such Qualified Employees with participation in a profit sharing bonus plan, subject to termination pursuant to the terms of such collective bargaining agreement.

F. *Definitions.* Unless otherwise specified, the capitalized terms under the Plan have the meanings given below:

*Affiliate.* "Affiliate" means any entity, corporate or otherwise, in which the Company, directly or indirectly, owns or controls a greater than 80% interest.

*Award.* "Award" means the dollar value of the award payable to a Qualified Employee for an Award Year as determined under the Plan.

*Award Year.* "Award Year" means the Plan Year for which a profit sharing Award, if any, is determined under the Plan.

*Base Percentage A.* "Base Percentage A" means the percentage determined in accordance with Section III.B.1.

*Base Percentage B.* "Base Percentage B" means the percentage determined in accordance with Section III.B.2.

*Board.* "Board" means the Board of Directors of the Company.

*Code.* "Code" means the Internal Revenue Code of 1986, as amended (including, when the context requires, all regulations, interpretations and rulings issued thereunder).

*Committee.* "Committee" means the Compensation Committee of the Board or such other committee appointed by the Board to exercise the powers and perform the duties assigned to the Compensation Committee under this Plan.

*Company.* "Company" means United Continental Holdings, Inc.

*Disability.* "Disability" means the Qualified Employee has been determined to be disabled under the Employer's long-term disability plan in which such Qualified Employee participates, under the union-sponsored long-term disability plan in which such Qualified Employee participates, or by the Company pursuant to Plan Rules.

*Domestic Employee.* "Domestic Employee" means any regular full-time or regular part-time U.S. employee of an Employer, and also includes (1) any internationally based flight attendant covered by the collective bargaining agreement between United Air Lines, Inc. and the Association of Flight Attendants, (2) any employee of Continental Micronesia, Inc. on the U.S. payroll, and (3) any employee designated by the Employer as an expatriate.

*Employer.* "Employer" means United Airlines, Inc., Continental Airlines, Inc., Continental Micronesia, Inc., Mileage Plus, Inc., and any other Affiliate which is designated by the Company from time to time as participating in the Plan.

*ERISA.* "ERISA" means the Employee Retirement Income Security Act of 1974, as from time to time amended, including any related regulations.

Case: 19-2546          Document: 32          Filed: 04/17/2020          Pages: 103

*Furlough.* "Furlough" means a Qualified Employee's termination of employment with the Employer in connection with which such Qualified Employee has reemployment rights, or, in the case of a Qualified Employee who is in a class or craft of employees covered by a collective bargaining agreement with the Employer pursuant to which the Employer has agreed to provide such Qualified Employees with participation in a profit sharing bonus plan, such other employment action as may be defined as a "furlough" in the applicable collective bargaining agreement.

*International Employee.* "International Employee" means any regular full-time or regular part-time employee of an Employer whose regular work is in a location outside of the United States, but does not include (1) any internationally based flight attendant covered by the collective bargaining agreement between United Air Lines, Inc. and AFA, (2) any employee of Continental Micronesia, Inc. on the U.S. payroll, or (3) any employee designated by the Company as an expatriate. In addition, any full-time or regular part-time employee who is not classified by an Employer as a "U.S. employee" shall be considered an International Employee.

*Management and Administrative Employee Group.* "Management and Administrative Employee Group" means those Domestic Employees of the Employer (i) who are classified by the Employer as management and administrative employees (on other than a temporary reclassification basis), (ii) whose employment is for an indefinite period, and (iii) who are employed in an Employer established job classification not covered by a collective bargaining agreement. In addition, the term "Management and Administrative Employee Group includes any class or craft of U.S. employees who are not covered by a collective bargaining agreement between an Employer and a union and who are not classified by the Employer as management and administrative employees but who nevertheless generally receive the same benefits as the Management and Administrative Employee Group.

*Officer.* "Officer" means (i) an "officer" of the Company as such term is defined in Rule 16a-1(f) under the Securities Exchange Act of 1934, as amended ("Rule 16a-1(f)"), or (ii) a designated senior officer of the subsidiaries of the Company, including any officer of United Air Lines, Inc. or Continental Airlines, Inc. who is an "officer" of the Company under Rule 16a-1(f) or who reports directly to the Chairman or the CEO.

*Participating Employee Group.* Each employee group set forth in Appendix B is a Participating Employee Group. Expressly excluded from the definition are: (i) any class or craft of employees represented by a union but not covered by an agreement between an Employer and such union expressly providing for coverage under a Company-sponsored (or Employer-sponsored) profit sharing plan; and (ii) International Employees. In the event of any conflict between Appendix B and a collective bargaining agreement, the collective bargaining agreement shall govern.

*Plan.* "Plan" means the United Continental Holdings, Inc. Profit Sharing Plan as set forth herein. The Plan is an amendment and restatement of the UAL Corporation Success Sharing Program – Profit Sharing Plan.

Case: 19-2546    Document: 32    Filed: 04/17/2020    Pages: 103

*Plan Rules.* "Plan Rules" means rules, procedures, policies or practices established by the Company (or the Committee) with respect to the administration of the Plan, which need not be reflected in a written instrument and may be changed at any time without notice.

*Plan Year.* "Plan Year" means the 12-month period that corresponds to the Company's fiscal year.

*Pre-Tax Margin.* "Pre-Tax Margin" means Pre-Tax Profit divided by Total Revenue as determined under U.S. generally accepted accounting principles.

*Pre-Tax Profit.* "Pre-Tax Profit" means the Company's consolidated net income as determined under U.S. generally accepted accounting principles, but excluding as determined by the Committee: (i) consolidated federal, state and local income tax expense (or credit); (ii) unusual, special, or non-recurring charges, (iii) charges with respect to the grant, exercise or vesting of equity, securities or options granted to employees of the Company or any Affiliate, and (iv) expense associated with the profit sharing contributions.

*Qualified Employee.* "Qualified Employee" means a Domestic Employee of an Employer who, in accordance with the Employer's personnel policies, has completed a year of service as of December 31 of the Award Year and satisfies the eligibility requirements of Section II.A.

*Retirement.* "Retirement" means the Employee has retired in accordance with the Employer's employment policies and regulations, including under an "early out" program in which the Company specifies (or otherwise determines in its sole discretion) that the Employee is to be considered retired for purposes of this Plan.

*Total Revenue.* "Total Revenue" means the Company's consolidated total revenue as determined under U.S. generally accepted accounting principles, but excluding, as determined by the Committee, any unusual, special or non-recurring revenue item.

*Wages.* "Wages" has the meaning provided in Section III.C.

## II.    **Participation.**

A.    *Eligibility.*  A Qualified Employee who is employed for any portion of an Award Year is eligible to receive payment of an Award for such Award Year, unless (1) prior to the end of the Award Year he or she voluntarily terminates employment or (2) prior to the payment date he or she is terminated "for cause" as determined by the Company. Termination of employment due to other reasons, such as involuntary termination (not "for cause"), voluntary termination after the end of the Award Year, death, Disability, Retirement, or Furlough do not disqualify a Qualified Employee from receiving payment of an Award for an Award Year.

B.    *Employee Classifications.*  The classification by an Employer of an individual as an

Pages: 103

Filed: 04/17/2020

Document: 32

Case: 19-2546

employee of an Employer within the meaning of the Plan, or as a person who is not an employee of an Employer or as being within a particular employee classification will be conclusive for all purposes of this Plan. For purposes of this Plan, a temporary reclassification or special assignment will be disregarded for purposes of determining a Qualified Employee's classification. No reclassification of an individual as an employee of an Employer, whether by judicial or administrative action or otherwise, will be effective to qualify the individual as a Qualified Employee under this Plan except as the Company agrees, and no reclassification will be given retroactive effect, except as the Company agrees.

### III.  <u>Profit Sharing Awards.</u>

A.  *Annual Threshold.*  After the end of each Award Year, if the Company's Pre-Tax Profit for that year exceeds ten million dollars ($10,000,000), Awards will be determined in accordance with Section III.B. If this threshold is not met, no Awards will be payable under the Plan for the Award Year.

B.  *Determination of Awards.*  Awards will be determined as follows:

1.  <u>Determination of Base Percentage A</u>:  Base Percentage A is equal to one percent (1%) of Pre-Tax Profit up to and including a Pre-Tax Margin of 6.9%, divided by the total Wages of all Qualified Employees of the Employers for the Award Year. Notwithstanding the foregoing, for the group of Qualified Employees covered by the collective bargaining agreement between the Company and the Association of Flight Attendants – CWA, Base Percentage A is equal to one percent (1%) of Pre-Tax Profit up to and including Pre-Tax Profit for the previous Plan Year.

2.  <u>Determination of Base Percentage B</u>:  Base Percentage B is equal to one percent (1%) of Pre-Tax Profit in excess of a Pre-Tax Margin of 6.9%, divided by the total Wages of all Qualified Employees of the Employers for the Award Year. Notwithstanding the foregoing, for the group of Qualified Employees covered by the collective bargaining agreement between the Company and the Association of Flight Attendants – CWA, Base Percentage A is equal to one percent (1%) of Pre-Tax Profit in excess of Pre-Tax Profit for the previous Plan Year.

3.  <u>Calculation</u>. Each Qualified Employee eligible under Section II shall be entitled to an Award equal to the following:

   a.  The Qualified Employee's Wages x Base Percentage A x the Factor for Base Percentage A set forth in Appendix B applicable to such Qualified Employee's Participating Employee Group;

   <u>Plus</u>

Pages: 103

Filed: 04/17/2020

Document: 32

Case: 19-2546

   b.  The Qualified Employee's Wages x Base Percentage B x the Factor for Base Percentage B set forth in Appendix B applicable to such Qualified Employee's Participating Employee Group.

C.  *Wages*.  Wages for a Plan Year will be determined as follows:

   1.  <u>Compensation Included</u>.  "Wages" will only include compensation paid (or payable) during a Plan Year to a Qualified Employee for the period he or she is a Qualified Employee and shall include the items listed in Paragraph A-1 of Appendix A.  Wages will include compensation not paid as a result of an earnings reduction election made by the Qualified Employee under a Code Sec. 125 cafeteria plan or under any qualified cash or deferred arrangement under Code Sec. 401(k).

   2.  <u>Exclusions</u>.  "Wages" will *not* include the items of compensation or other payments listed in Paragraph A-2 of Appendix A.

   3.  <u>Reemployment</u>.  In the event a Qualified Employee terminates employment and is reemployed by an Employer, such employee's Wages will include amounts paid during the applicable Plan Year, both prior to the termination and following such reemployment.

   4.  <u>Change of Position</u>.  In the event that a Qualified Employee transfers from one Employee Group to another Employee Group during the calendar year, the Qualified Employee's Wages while a member of each Employee Group shall be distinguished and applied to the appropriate formula under Section III.B.

   5.  <u>Determination of Wages</u>.  Subject to the provisions of Appendix A, the Company's Executive Vice President – Human Resources and Labor Relations will determine, in his or her discretion (subject to a contrary requirement under any applicable collective bargaining agreement determination under any applicable collective bargaining agreement grievance procedure in the case of an employee who is in the class or craft of employees covered by a collective bargaining agreement), whether an item of compensation is included or excluded from the definition of "Wages."

D.  *Time of Payment*.  Award payments will be made following determination of the Company's Pre-Tax Profit for the fiscal year, but not later than March 15 or as soon as administratively practicable thereafter.  Notwithstanding the foregoing, the Committee may, in its reasonable discretion, vary the time for making the payments provided herein, provided such modification does not cause the payments to become subject to the tax under Section 409A of the Code.  Nothing herein shall be construed to grant to any Qualified Employee who is entitled to payment of an Award or to any person claiming under or through such Qualified Employee the right to elect a modification of the time for receiving payments hereunder.

UCH PSP                6              January 1, 2016 (FINAL)

Appx47

E.    *Payment Methods*.  Each Qualified Employee entitled to an Award will receive payment of the Award in cash, subject to such employee's right, if any, to elect to defer receipt of a portion of such cash payment as may be permitted under any Employer-sponsored 401(k) plan in which the Qualified Employee is eligible to participate.  Payment is subject to any applicable withholding taxes and other amounts the Company reasonably determines it is obligated to withhold or deduct pursuant to federal, state or local laws.  Notwithstanding the foregoing:

1.    The Committee shall have the right, in its reasonable discretion, to vary the form of payment of Awards payable to Officers by payment in shares of the Company's common stock.  In the event the Company reasonably anticipates that the Company's deduction with respect to a payment otherwise would be limited or eliminated by application of Section 162(m) of the Code, the Committee may enter into an agreement with an Officer to provide payment of an Award on a deferred basis through a bookkeeping account, the value of which may be determined by reference to the Company's common stock, provided such written deferred payment arrangement complies with the requirements of Section 409A of the Code, including the requirement that the payment be made either at the earliest date at which the Company reasonably anticipates the payment of the amount will not be limited or eliminated by application of Section 162(m) of the Code or the calendar year in which the officer separates from service with the Company and all affiliates.

2.    Payment of Awards for any employee group shall be made as a profit sharing contribution to the applicable Employer-sponsored 401(k) plan if required under the terms of the applicable collective bargaining agreement or, in the case of the Management and Administrative Employee Group, if so determined by the Company.

## IV.    <u>Plan Administration.</u>

A.    *Plan Administration*.  The Company or its delegate has the authority and responsibility to manage and control the general administration of the Plan, except as to matters expressly reserved in the Plan to the Committee.  Determinations, decisions and actions of the Company or, if applicable, the Committee, in connection with the construction, interpretation, administration, or application of the Plan will be final, conclusive, and binding upon any person, including any employee of any Employer, any Qualified Employee and any person claiming under or through the Qualified Employee.  No employee of an Employer, any member of the Board, any delegate of the Board, or any member of the Committee will be liable for any determination, decision, or action made in good faith with respect to the Plan or any Award made under the Plan.

B.    *Committee*.  The Committee has the sole authority and responsibility to administer Awards payable to Officers.

# V. **Amendment or Termination.**

A. *Authority to Amend or Terminate Plan.* The Plan may at any time be amended, modified, suspended or terminated, as the Company in its sole discretion determines. Such amendment, modification, or termination of the Plan will not require any notice or the consent, ratification, or approval of any party, including any Qualified Employee who is then eligible to participate in the Plan.

B. *Authority to Amend Awards.* The Committee in its sole discretion may reduce or eliminate an Award payable to any member of the Management and Administrative Employee Group classified by the Company as a management employee. In addition, the Company may reduce any Award other than an Award payable to an Officer, prior to the payment of the Award, to the extent it deems necessary or appropriate to comply with laws, including applicable securities laws, local laws outside the United States and the pooling of interests requirements in connection with a merger, provided that nothing in this Section V.B affects the rights of any employee to an Award required under the terms of a collective bargaining agreement.

# VI. **Miscellaneous.**

A. *No Contract of Employment, etc.* Neither this Plan nor any award under the Plan constitutes a contract of employment and participation in the Plan will not give any employee the right to be retained in the service of the Company or any Affiliate or to continue in any position or at any level of compensation. Nothing contained in the Plan will prohibit or interfere with the Company's or an Affiliate's right to assign projects, tasks and responsibilities to any employee or to alter the nature of the Company's or an Affiliate's rights with respect to the employee's employment relationship, including the right to terminate any employee at any time, with or without prior notice, and for any reason within the constraints of existing law.

B. *Governing Law.* The validity, construction, interpretation, administration and effect of the Plan and any rules, regulations and actions relating to the Plan will be governed by and construed exclusively in accordance with the laws of the United States and the State of Illinois, notwithstanding the conflicts of law principles of any jurisdiction.

C. *Conflict.* Notwithstanding anything to the contrary in the Plan, the Plan Rules or Plan administration, the Employer's obligations to any employees covered by collective bargaining agreements shall be governed by the applicable terms of such agreements, and any conflict between the terms of the Plan, the Plan Rules or Plan administration and the applicable collective bargaining agreements with respect to such employees shall be resolved in favor of the Employer's obligations under the applicable collective bargaining agreements.

IN WITNESS WHEREOF, the Company has caused this amendment and restatement of the Plan to be executed on its behalf, effective as of January 1, 2016, except as otherwise provided herein.

UNITED CONTINENTAL HOLDINGS, INC.

Michael P. Bonds
Executive Vice President
Human Resources and Labor Relations

Dated: _12/20/2016_

# APPENDIX A - WAGES

**A-1.** **Inclusions.** For purposes of Section III.C.1. the following items are included in the definition of Wages:

- base pay
- overtime pay
- holiday pay
- longevity pay
- sick pay
- lead/purser/service director pay
- high skill premium/longevity pay
- language premium
- international and night flying premium pay
- pay for time taken as vacation
- payment for accrued vacation not taken as vacation when paid on account of (i) a leave or (ii) a termination of employment due to a reduction in force or for a military leave
- shift differential pay
- back pay to the extent such pay is otherwise categorized as Wages related to the applicable Plan Year (other than judicial or administrative awards of grievance pay or back pay (including settlements thereof))
- delayed activation pay
- bypass pay
- check pilot premium pay
- double town salary expense
- senior/junior manning pay
- operational integrity pay
- temporary reclass pay
- Hawaiian override

**A-2.** **Exclusions.** For purposes of Section III.C.2. the following items are excluded in the definition of Wages:

- deferred compensation (other than pursuant to Code Sec. 125 or 401(k))
- moving expense and similar allowances
- performance incentive awards, profit sharing awards or sales incentive awards
- expense reimbursements and per diems
- severance, termination pay and related payments
- payment for accrued vacation time not taken as vacation when paid on account of termination of employment, other than on account of a reduction in force or for a military leave
- disability and workers compensation payments
- duty-free commissions
- recognition lump sums
- flight expense

Pages: 103   Filed: 04/17/2020   Document: 32   Case: 19-2546

Pages: 103

Filed: 04/17/2020

Document: 32

Case: 19-2546

- retropay created by execution of a collective bargaining agreement, unless the collective bargaining agreement requires inclusion
- reimbursable cleaning
- Employer contributions to employee benefit plans
- solely for purposes of making an award payment under this Plan, judicial or administrative awards for grievance pay or back pay (including settlements thereof)
- imputed income for employee or dependent life insurance coverage
- imputed income from pass service charges
- taxable travel
- imputed income from domestic partner benefits
- cash payments made pursuant to any agreement, program, arrangement or plan designed to compensate an employee for amounts that may not be credited or allocated to the employee under a qualified retirement plan due to limitations imposed by tax laws
- taxable fringe benefits, including taxable reimbursement of insurance premiums
- expatriate allowances
- hiring bonuses or other special payments relating to the initiation of employment
- amounts realized with respect to restricted stock, non-qualified stock options or stock appreciation rights
- lost luggage advance
- interest payments
- taxable distributions of the Company's common stock or notes (including cash in lieu of such stock or notes) made in connection with UAL Corporation's confirmed plan of reorganization under Chapter 11 of the U.S. Bankruptcy Code
- payments made to employees domiciled outside of the United States that are in lieu of Employer contributions to a retirement plan
- any amount counted as wages under this Plan or any other profit sharing plan for a prior Award Year.

**A-3.** **<u>Special Crediting Rule</u>.** For purposes of allocating Wages earned by a Qualified Employee for services rendered during a Plan Year but received following termination of employment, such Wages will be treated as received on the Qualified Employee's last day of employment with the Employer.

**APPENDIX B - FACTORS**

| Labor Group | Union Representation | Union Code | Factor for Base Percentage A | Factor for Base Percentage B |
|---|---|---|---|---|
| **Joint Agreements** | | | | |
| Customer Service Representatives | IAM | PCE | 5 | 10 |
| Dispatchers | PAFCA | DIS | 5 | 10 |
| Fleet Service Employees | IAM | RMP | 5 | 10 |
| Pilots | ALPA | PT, SPT | 10 | 20 |
| Reservations Representatives | IAM | PCE | 5 | 10 |
| Storekeeper Employees | IAM | RMP | 5 | 10 |
| Flight Attendants | AFA | FA, IFA | 10 | 20 |
| Maintenance Instructors | IAM | MTI | 5 | 10 |
| Emergency Procedure Instructors | IAM | FTI | 5 | 10 |
| **Individual Agreements** | | | | |
| Central Load Planners | IAM | CLP | 5 | 10 |
| Food Service Personnel | IAM | FS | 15 | 15 |
| Simulator Technicians* | IBT | MEC, MGT | 5 | 10 |
| Technicians* | IBT | MEC | 5 | 10 |
| **Non-Union** | | | | |
| Chelsea Food Service | None | FS | 5 | 10 |
| FQM (Flight Qualified Management) | None | FMT | 5 | 10 |
| Management & Administrative | None | SAL, MGT, OFC, SIA, SLS, TPT | 5 | 10 |

\* Factors for Technicians and Simulator Technicians for 2016 profit sharing paid in 2017 are 15 and 15.

Pages: 103

Filed: 04/17/2020

Document: 32

Case: 19-2546

# FIRST AMENDMENT TO
## UNITED CONTINENTAL HOLDINGS, INC.
## PROFIT SHARING PLAN (2016)

WHEREAS, United Continental Holdings, Inc. (the "Company") sponsors the United Continental Holdings, Inc. Profit Sharing Plan (the "Plan");

WHEREAS, Appendix B of the Plan sets forth the Factors used in the determination of profit sharing Awards for each Participating Employee Group under Section III.B.3 of the Plan;

WHEREAS, the Company has reached joint collective bargaining agreements and certain other agreements with various represented employee groups, necessitating certain changes to Appendix B, effective for the 2017 Plan Year and thereafter;

WHEREAS, Section V.A reserves to the Company the right to amend the Plan in its sole discretion; and

WHEREAS, the Company has previously delegated the authority to amend the Plan with respect to changes relating to implementation of collective bargaining agreements to the Company's Executive Vice President Human Resources and Labor Relations;

NOW, THEREFORE, the Plan is hereby amended effective January 1, 2017, for the 2017 Plan Year and thereafter, as set forth below:

## "APPENDIX B - FACTORS

| Labor Group | Union Representation | Factor for Base Percentage A | Factor for Base Percentage B |
|---|---|---|---|
| **Represented** | | | |
| Central Load Planners | IAM | 5 | 10 |
| Customer Service Representatives | IAM | 5 | 10 |
| Dispatchers | PAFCA | 5 | 10 |
| Fleet Service Employees | IAM | 5 | 10 |
| Flight Attendants | AFA | 10 | 20 |
| Maintenance Instructors | IAM | 5 | 10 |
| Pilots | ALPA | 10 | 20 |
| Reservations Representatives | IAM | 5 | 10 |
| Simulator Technicians | IBT | 5 | 10 |
| Storekeeper Employees | IAM | 5 | 10 |
| Technicians | IBT | 5 | 10 |
| **Non-Represented** | | | |
| Chelsea Food Service | None | 5 | 10 |
| Flight Qualified Management | None | 5 | 10 |
| Management & Administrative | None | 5 | 10" |

IN WITNESS WHEREOF, the Company has caused this amendment to be executed on its behalf this 29th day of January, 2018.

UNITED CONTINENTAL HOLDINGS, INC.

Kate Gebo
Executive Vice President,
Human Resources and Labor Relations

2

UCH 2016 PSP

**Appx55**

# EXHIBIT B

# UNITED PILOT AGREEMENT

AGREEMENT

BETWEEN

UNITED AIRLINES, INC.

AND THE

AIR LINE PILOTS

IN THE SERVICE OF

UNITED AIRLINES, INC.

AS REPRESENTED BY THE

AIR LINE PILOTS ASSOCIATION, INTERNATIONAL




## SECTION 1 -RECOGNITION, SCOPE AND CAREER SECURITY ..................................................... 11

| | | |
|---|---|---|
| 1-A | Recognition | 11 |
| 1-B | Scope | 11 |
| 1-C | Code Sharing, Marketing, Ownership and Other Arrangements | 13 |
| 1-D | Successorship | 23 |
| 1-E | Other Labor Protective Provisions | 26 |
| 1-F | Labor Disputes | 27 |
| 1-G | Foreign Ownership and Bases | 27 |
| 1-H | Board Seat | 27 |
| 1-I | General Furlough Protection | 28 |
| 1-J | Review Committee | 28 |
| 1-K | Remedies | 29 |
| 1-L | Definitions | 29 |

## SECTION 2 - DEFINITIONS ..................................................................................................... 34

| | | |
|---|---|---|
| 2-A | Active Employment, Active Service, Active Pilot | 34 |
| 2-B | Actual Operation. | 34 |
| 2-C | Arrival | 34 |
| 2-D | Base | 34 |
| 2-E | Basic Duty Period | 34 |
| 2-F | Basic Flight | 34 |
| 2-G | Basic Reserve | 34 |
| 2-H | Basic Trip | 34 |
| 2-I | Bid Period. | 34 |
| 2-J | Captain | 35 |
| 2-K | Category | 35 |
| 2-L | Class 1 Crew Rest Facility | 35 |
| 2-M | Class 2 Crew Rest Facility | 35 |
| 2-N | Class 3 Crew Rest Facility | 35 |
| 2-O | Day | 35 |
| 2-P | Deadhead Time | 35 |
| 2-Q | Departure | 35 |
| 2-R | Duty Period | 35 |
| 2-S | Equipment. | 35 |
| 2-T | Equipment-Base | 35 |
| 2-U | Established by FAR | 35 |
| 2-V | First Officer | 36 |
| 2-W | Flight or Flight Segment. | 36 |
| 2-X | Flight Time. | 36 |
| 2-Y | Flown by Operations - ("FBO") | 36 |
| 2-Z | Flying Flight Segment | 36 |
| 2-AA | G-Line | 36 |
| 2-BB | Gender Pronouns | 36 |
| 2-CC | Global Duty Period. | 36 |

2-DD    GLOBAL FLIGHT.................................................................................36
2-EE    GLOBAL TRIP...................................................................................36
2-FF    GLOBAL RESERVE...............................................................................36
2-GG    HOLIDAY......................................................................................36
2-HH    INVOLUNTARY FURLOUGH.........................................................................36
2-II    LINE CREDIT..................................................................................36
2-JJ    LINE OF FLYING...............................................................................36
2-KK    LINE PRODUCTION AVERAGE (LPA)................................................................36
2-LL    LINEHOLDER...................................................................................37
2-MM    MONTHLY SCHEDULE PREFERENCING................................................................37
2-NN    OFF-DUTY PERIOD..............................................................................37
2-OO    ON-LINE......................................................................................37
2-PP    OPEN FLYING..................................................................................37
2-QQ    OPEN TRIP....................................................................................37
2-RR    PILOT........................................................................................37
2-SS    PREFERENTIAL BIDDING SYSTEM (PBS)............................................................37
2-TT    REASSIGNMENT OR REASSIGNED...................................................................37
2-UU    RESERVE......................................................................................38
2-VV    SCHEDULE REPAIR..............................................................................38
2-WW    STATUS.......................................................................................38
2-XX    SURFACE DEADHEADING..........................................................................38
2-YY    TRIP.........................................................................................38

SECTION 3 - COMPENSATION ............................................................................39
3-A    PAY RATES....................................................................................39
3-B    LONGEVITY FOR PAY............................................................................42
3-C    BASE PAY.....................................................................................43
3-D    ADD PAY......................................................................................51
3-E    TRAINING PAY.................................................................................51
3-F    VACATION PAY.................................................................................52
3-G    OTHER PAID ABSENCES AND ACTIVITIES...........................................................52
3-H    PROFIT SHARING...............................................................................53
3-I    MISCELLANEOUS................................................................................53
3-J    NEW AIRCRAFT TYPES...........................................................................54

SECTION 4 - EXPENSES, LODGING, AND TRANSPORTATION ...................................................56
4-A    PER DIEM.....................................................................................56
4-B    HOTEL GUIDELINES.............................................................................59
4-C    HOTEL ACCOMMODATIONS AND PILOT LOUNGES.......................................................59
4-D    TRANSPORTATION...............................................................................60
4-E    TEMPORARY FLIGHT DUTY ("TDY") AND SPECIAL ASSIGNMENT.........................................62
4-F    UNIFORMS.....................................................................................63
4-G    NEW HIRE PILOTS..............................................................................63
4-H    MISCELLANEOUS EXPENSES.......................................................................63

**SECTION 5 -HOURS OF SERVICE** .......................................................................... **64**

5-A    NON-COMPANY FLYING ............................................................... 64
5-B    LIMITATIONS ON HOURS OF SERVICE ..........................................64
5-C    DEADHEAD ................................................................................... 68
5-D    DEADHEAD DEVIATION ................................................................ 70
5-E    SCHEDULED ON-DUTY PROVISIONS .............................................73
5-F    ACTUAL ON-DUTY PROVISIONS ...................................................88
5-G    MINIMUM PAY VALUE PROVISIONS ..............................................98
5-H    FIELD STANDBY ASSIGNMENTS ....................................................99
5-I     CREW COMPOSITION .................................................................. 100
5-J     CREW REST FACILITIES .............................................................. 101

**SECTION 6 -SENIORITY** ...................................................................................... **105**

6-A    GENERAL ................................................................................... 105
6-B    SENIORITY LIST ........................................................................... 105
6-C    PERIOD OF PROBATION ............................................................... 105
6-D    REMOVAL FROM THE SENIORITY LIST ......................................... 106
6-E    NON-FLYING, SUPERVISORY OR MANAGEMENT DUTY OR SPECIAL ASSIGNMENT ............................. 106

**SECTION 7 - FURLOUGH & RECALL** ................................................................. **107**

7-A    NOTICE AND ASSIGNMENT .......................................................... 107
7-B    PROBATIONARY PILOTS ............................................................... 107
7-C    CHANGE OF ADDRESS ................................................................. 107
7-D    MILITARY LEAVE UPON RECALL ................................................. 108
7-E    RECALL ...................................................................................... 108
7-F    SENIORITY .................................................................................. 108
7-G    FURLOUGH PAY .......................................................................... 108
7-H    BENEFITS ................................................................................... 109
7-I     DISPLACEMENT ........................................................................... 110

**SECTION 8 - STAFFING** ....................................................................................... **110**

8-A    CLASSIFICATION OF CATEGORIES ................................................ 110
8-B    MANPOWER REQUIREMENTS ....................................................... 110
8-C    VACANCY BULLETINS, BIDDING AND AWARDING .......................... 111
8-D    ELIGIBILITY TO BE AWARDED VACANCIES .................................... 112
8-E    DISPLACEMENT BULLETINS, BIDDING AND AWARDS ..................... 114
8-F    ACTIVATION OF ASSIGNMENT ..................................................... 117
8-G    TEMPORARY DUTY ASSIGNMENTS (TDY) ................................... 121
8-H    OPENING A CATEGORY OR CLOSING A BASE ................................ 127
8-I     MISCELLANEOUS ........................................................................ 128

**SECTION 9 - TRAINING** ...................................................................................... **132**

9-A    CLASSIFICATIONS ........................................................................ 132
9-B    ASSIGNMENT TO TRAINING ........................................................ 132

**Appx60**

| 9-C | Schedule Considerations | 136 |
| 9-D | Transportation | 137 |
| 9-E | Expenses | 139 |
| 9-F | Training Schedules | 140 |
| 9-G | General | 141 |
| 9-H | Waivers | 144 |
| 9-I | Special Qualifications | 144 |
| 9-J | New Training | 145 |

## SECTION 10 MOVING EXPENSES ............ 149

| 10-A | Applicability of this Section and the Pilot Transfer and Moving Handbook | 149 |
| 10-B | Career Move | 149 |
| 10-C | Paid Move Conditions | 149 |
| 10-D | Paid Move Commuter Passes | 150 |
| 10-E | Paid Move Travel Days and Expenses | 151 |
| 10-F | Paid Move Miscellaneous Allowance | 152 |
| 10-G | Transfer Days and Expenses | 153 |
| 10-H | Relocation Passes | 154 |
| 10-I | Overlapping Entitlements | 154 |
| 10-J | Mileage Reimbursement | 154 |
| 10-K | General | 155 |

## SECTION 11 - VACATIONS ............ 156

| 11-A | Vacation Accrual | 156 |
| 11-B | Pay Out at Time of Separation | 157 |
| 11-C | Vacation Pay Value | 157 |
| 11-D | Vacation Awarding | 157 |
| 11-E | Annual Vacation | 157 |
| 11-F | Changing or Canceling Awarded Vacation | 160 |
| 11-G | Vacation Trip Drop | 162 |
| 11-H | Vacation Forfeiture | 162 |
| 11-I | Military Pilot Vacation Allocation | 163 |

## SECTION 12 -LEAVES OF ABSENCE ............ 165

| 12-A | Personal Leave ("PLA") | 165 |
| 12-B | Medical Leave ("MLA") | 165 |
| 12-C | Company Offered Leaves of Absence ("COLA") | 165 |
| 12-D | Military Leave ("MLOA") | 165 |
| 12-E | Family & Medical Leave ("FMLA") | 166 |
| 12-F | Maternity/Parental Leave of Absence ("MPLA") | 169 |
| 12-G | Emergency Leave of Absence ("ELA") | 169 |
| 12-H | Return From Leave | 170 |
| 12-I | Leaves of Absence General | 171 |
| 12-J | Benefits While On Leave | 172 |

**Appx61**

**SECTION 13 - SICK LEAVE** ................................................................................. **174**

13-A    Accrual, Restoration and Pay ............................................................... 174
13-B    Separation of Employment .................................................................... 177
13-C    Statement of Accrual ........................................................................... 177

**SECTION 14 - PHYSICAL EXAMINATIONS** ........................................................ **178**

14-A    Company Medical Examiner ................................................................. 178
14-B    Pilot Medical Examiner ....................................................................... 178
14-C    Pay during Examinations ..................................................................... 179

**SECTION 15 - WORKER'S COMPENSATION BENEFITS** ..................................... **180**

15-A    Applicability of Law ............................................................................ 180
15-B    Beneficiaries ..................................................................................... 180

**SECTION 16 - MISSING, INTERNMENT, HOSTAGE, OR PRISONER OF WAR BENEFITS** .............. **181**

16-A    Longevity and Bidding .......................................................................... 181
16-B    Compensation ..................................................................................... 181
16-C    Imprisoned ......................................................................................... 181
16-D    Review .............................................................................................. 181

**SECTION 17 - GRIEVANCES** ............................................................................. **183**

17-A    Non-Disciplinary Grievances ............................................................... 183
17-B    Discipline and Discharge ..................................................................... 184
17-C    General ............................................................................................. 187
17-D    Grievance Mediation .......................................................................... 189

**SECTION 18 - SYSTEM BOARD OF ADJUSTMENT** ............................................ **190**

18-A    Establishment of the Board .................................................................. 190
18-B    Composition of the Board .................................................................... 190
18-C    Jurisdiction of the Board ..................................................................... 191
18-D    Proceedings Before The Board ............................................................ 191
18-E    The Panel of Arbitrators ..................................................................... 192
18-F    General ............................................................................................. 193

**SECTION 19 - FLIGHT SAFETY PROGRAMS** ...................................................... **195**

19-A    Introduction ....................................................................................... 195
19-B    Safety Program Integration .................................................................. 195
19-C    Administration of Data/Information ....................................................... 196
19-D    Remediation ....................................................................................... 197
19-E    ALPA Accident/Incident Go-Team ....................................................... 197
19-F    Data Recorders and Cockpit Voice Recorders ....................................... 198
19-G    Flight Operational Quality Assurance ("FOQA") ................................... 199
19-H    Flight Safety Action Program ("FSAP") ............................................... 202
19-I    Flight Safety Investigation ("FSI") ...................................................... 202

19-J    Line Operations Safety Audit ("LOSA").................................................................207
19-K    Fatigue Risk Management System ("FRMS") .................................................209

**SECTION 20 - ALLOCATION, ASSIGNMENT AND SCHEDULING OF FLYING .............................. 210**

20-A    General .................................................................................................................210
20-B    Preparing for Monthly Schedule Preferencing .................................................213
20-C    Monthly Schedule Preferencing ........................................................................214
20-D    After Monthly Schedule Preferencing ...............................................................217
20-E    System Schedule Committee ...........................................................................218
20-F    Assignment or Reassignment After Loss of Flying, Training Assignment or Other Absence and Activity..................................................................................................................219
20-G    Open Flying .........................................................................................................226
20-H    Open Trip or Flying Coverage At Equipment-Bases .........................................227
20-I    Covering Assignments At Equipment-Bases During the Assignment Window ...................232
20-J    Open Flying Coverage At Non-Equipment-Bases..............................................239
20-K    Scheduling of Reserve Crews ............................................................................239
20-L    Reassignments ...................................................................................................248
20-M    Long Delays ........................................................................................................250
20-N    Restoration of Lineholder Lost Day Off .............................................................251
20-O    Abnormal Operations .........................................................................................252
20-P    Trip-Trading ........................................................................................................253
20-Q    Miscellaneous ....................................................................................................255
20-R    Maintenance of First Officer Landing Currency................................................265

**SECTION 21 - GENERAL.............................................................................................. 268**

21-A    Company Equipment ..........................................................................................268
21-B    Personnel and Training Files..............................................................................268
21-C    Change in Uniform .............................................................................................268
21-D    Copy of Agreement ............................................................................................268
21-E    Pass ....................................................................................................................268
21-F    International ........................................................................................................269
21-G    No Discrimination ...............................................................................................269
21-H    Parking ...............................................................................................................269
21-I    Indemnification ...................................................................................................270
21-J    Jumpseats ...........................................................................................................270
21-K    Change in Personnel Policy ................................................................................270
21-L    Electronic Notifications and Postings ................................................................270
21-M    Crew Complement ..............................................................................................271
21-N    Jury Duty.............................................................................................................271
21-O    No Cameras in Cockpit .......................................................................................272
21-P    Commuter Policy .................................................................................................272
21-Q    Federal Flight Deck Officer (FFDO) ....................................................................273
21-R    Hiring Standards .................................................................................................273
21-S    Order to Fly .........................................................................................................273

21-T    CREW SCHEDULING SYSTEM ................................................................273
21-U    EFFECT OF LAW.................................................................................273
21-V    SUPPLEMENTAL BOTTLED WATER..........................................................274
21-W    HARDSHIP........................................................................................274
21-X    PILOT AND FAMILY REMAINS .................................................................275
21-Y    JOB SHARE/MANAGEMENT PILOTS..........................................................275
21-Z    CONFLICT OF INTEREST ........................................................................276
21-AA   INCORRECT SEATING WHEN DEADHEADING OR TRAVELING TO OR FROM TRAINING .........276
21-BB   WAIVER OF SECTIONS 5 & 20 PROVISIONS .................................................277
21-CC   LONGEVITY .......................................................................................277
21-DD   EXPENSES.........................................................................................277

**SECTION 22 - RETIREMENT** ......................................................................**278**

22-A    DEFINED CONTRIBUTION PLAN ...............................................................278
22-B    DEFINED BENEFIT PLANS ......................................................................283
22-C    GENERAL PROVISIONS ..........................................................................284

**SECTION 23 - FLIGHT INSTRUCTORS AND EVALUATORS** ......................................**288**

23-A    SCOPE OF WORK AND GENERAL ..............................................................288
23-B    FILLING OF I/E VACANCIES .....................................................................290
23-C    CONSOLIDATION PROCEDURES ...............................................................290
23-D    SCHEDULING .....................................................................................291
23-E    HOURS OF SERVICE .............................................................................293
23-F    NON-TRAINING ASSIGNMENTS .................................................................294
23-G    RESERVE ASSIGNMENTS .......................................................................294
23-H    OVERTIME EVENTS ..............................................................................295
23-I    TDY ASSIGNMENTS ..............................................................................296
23-J    SICK LEAVE ......................................................................................297
23-K    LINE FLYING ......................................................................................297
23-L    COMPENSATION..................................................................................300
23-M    VACANCY BIDDING ..............................................................................301
23-N    PAID MOVE .......................................................................................301
23-O    EXPENSES ........................................................................................301
23-P    VACATION .........................................................................................302
23-Q    RETURN TO LINE ASSIGNMENT ...............................................................304
23-R    JOB-SHARE (JS) I/E .............................................................................304
23-S    LINE CHECK AIRMEN ............................................................................309

**SECTION 24 - INSURANCE** ........................................................................**311**

24-A    PLANS AND ELIGIBILITY .........................................................................311
24-B    ACTIVE PILOT MEDICAL BENEFITS, INCLUDING PRESCRIPTION DRUG BENEFITS .................313
24-C    ACTIVE PILOT DENTAL BENEFITS.............................................................316
24-D    ACTIVE PILOT VISION BENEFITS ..............................................................318
24-E    ACTIVE PILOT FLEXIBLE SPENDING ACCOUNT PLANS.....................................319

24-F    Retiree Medical Benefits .................................................................... 319
24-G    Retiree Health Account (RHA) VEBA .............................................. 324
24-H    LTD Plan ........................................................................................... 326
24-I    Active Life & Accident Insurance ....................................................... 332
24-J    General .............................................................................................. 333

**SECTION 25 - DURATION ....................................................................... 345**

25-A    Amendable Date ................................................................................ 345
25-B    Incorporation of Other Agreements ................................................. 345
25-C    ALPA Ratification Process ................................................................ 349

**LETTERS OF AGREEMENT ..................................................................... 352**

LOA 12-01    Guam Flying ............................................................................ 353
LOA 12-02    Occupation Injury Bank Conversion ....................................... 361
LOA 12-03    Trip Trading ............................................................................ 363
LOA 12-04    Medical and Dental Rate Setting ............................................ 369
LOA 12-05    Long Term Disability Plan Transition ...................................... 380
LOA 12-06    Union Security and Check-Off ................................................ 390
LOA 12-07    iPads ....................................................................................... 404
LOA 12-08    Professional Standards ........................................................... 406
LOA 12-09    United Express Job Opportunities for Furloughed United Pilots ........ 410
LOA 12-10    HIMS Program ......................................................................... 414
LOA 12-11    UAX Performance Information ................................................ 416
LOA 12-12    Indemnity Agreement ............................................................ 418
LOA 12-13    CRAF/AMC/AMC MEDEVAC .............................................. 421
LOA 12-14    Association Business .............................................................. 441
LOA 12-15    FRMS Scheduling ................................................................... 445
LOA 12-16    Merger Transition Issues ........................................................ 449
LOA 16-01    Fatigue Risk Management System ......................................... 451
LOA 16-02    IAH Training Center Closure .................................................. 454
LOA 18-01    Transitory and Implementation Details of Unimplemented and Disputed Items LOA .459
LOA 18-02    PILOT CONSIDERED ADVISED UNDER 20-F-1 ...................... 462
LOA 18-03    REASSIGNMENTS DUE TO LIMIT BUFFERS ............................ 464
LOA 18-04    MODIFICATIONS TO SECTIONS 17 AND 18 ......................... 467

**MEMORANDA OF UNDERSTANDING ................................................... 462**

MOU 12-01  Workers' Compensation Benefits (Illinois) .............................. 463
MOU 12-02  JFK Memorial ........................................................................... 464
MOU 12-03  KC Delay Reporting .................................................................. 465
MOU 12-04  Longevity for Pass Travel ........................................................ 467
MOU 12-05  570 Seniority Dates ................................................................. 468
MOU 12-06  Transition MOU for Legacy Continental Flight Instructors ...... 469

MOU 12-07 Parent Agreement ................................................. 471

MOU 14-01 Fatigue Risk Management Data Collection ........................... 473

MOU 16-01 Clarification of Sections 3-C-3-e, 5-B-2-b-(1) and 5-B-2-c-(1) ................. 476

MOU 16-02 FSAP – Flight Operations Aviation Safety Action Program ..................... 478

MOU 17-01 Administration of LTD Payroll Deductions ............................ 489

MOU 18-01 Sick Leave Proration.................................................. 513


**GRIEVANCE SETTLEMENTS** ............................................... **492**

Remedy for Trip-Trade / Pick-Up Errors ........................................ 493

Assignment of Low-Time Pilots.................................................. 497

# Section 1 -Recognition, Scope and Career Security

**Section last updated on 12/20/2017**

## 1-A    Recognition

The Air Line Pilots Association, International (the "Association"), has furnished the Company evidence that a majority of the airline pilots and flight instructors employed by the Company have designated the Association to represent them and in their behalf negotiate and conclude an agreement with the Company as to hours of labor, wages and other employment conditions covering the pilots and flight instructors in the employ of the Company in accordance with the provisions of Title II of the Railway Labor Act, as amended and the certifications issued by the National Mediation Board in Case Nos. R-7305 and R-7306.

## 1-B    Scope

The Pilots and flight instructors on the Seniority List (the "United Pilots," "United pilots," "Company Pilots," or "Company pilots") shall have the sole and exclusive right to perform, train, and be trained to perform Company Flying and operate Company Aircraft in accordance with the terms and conditions of this agreement or any other applicable agreement or agreements between the Company and the Association (together, the "Agreement").

**1-B-1** Company Flying

Except as provided in Section 1-B-2, "Company Flying" includes without limitation all commercial flight operations of any sort whatsoever, whether revenue, nonrevenue, scheduled or unscheduled, conducted (i) by or for the Company or a Company Affiliate, or (ii) by the Company or a Company Affiliate for other air carriers, (iii) by an Entity managed by or under the Control of the Company or a Company Affiliate, or (iv) pursuant to an agreement or arrangement with the Company or Company Affiliate not permitted by Sections 1-C or 1-D.

**1-B-1-a** All ferry or delivery flights that are not included in the exception to Company Flying contained in Section 1-B-2(i) below will be performed by Pilots on the United Pilots Seniority List.

**1-B-1-a-(1)** Notwithstanding Section 1-B-1-a above, if the Company assigns engineering or test pilots not on the United Pilots Seniority List to operate a new aircraft delivery flight, the Company will be required to remove a line crew in accordance with Section 20-Q-15 (hereafter, "FBO"). Such operation by engineering or test pilots shall be limited to transferring the aircraft from the manufacturer's facility or home airfield to the United station at which modifications for introduction to line service are performed. Line Pilots shall operate the flight out of the United station once modifications are complete.

**1-B-1-a-(2)** The Company may request any additional relief from Section 1-B-1-a on a case by case basis from the MEC Chairman.

**1-B-1-b** Notwithstanding Section 1-B-1 above, if two line crews refuse an aircraft for any reason, the Company may assign engineering or test pilots not on the United Pilots Seniority

List to operate a ferry flight to reposition the aircraft. The Company is not required to FBO a line crew for any such ferry flight.

**1-B-2** Not Included in Company Flying

Company Flying does not include flight operations that are (i) normally performed by the Company's engineering and test pilots, provided such flights either require performance of diagnostic tests which pilots who perform Company Flying are not trained to perform or involve flights that take off and land at the same facility with no intermediate stop, or (ii) conducted by a United Express Carrier pursuant to Section 1-C-1, or (iii) conducted by a Domestic Air Carrier pursuant to Section 1-C-2, or (iv) conducted by a Foreign Air Carrier pursuant to Section 1-C-3, or (v) conducted by an Affiliate with which the Company is engaged in an Operational Merger following a Merger Transaction but before the Operational Merger subject to Section 1-D, or (vi) conducted by any other air carrier in accordance with an Industry Standard Interline Agreement.

**1-B-2-a** Flights that "require performance of diagnostic tests which pilots who perform Company Flying are not trained to perform", as stated in Section 1-B-2(i) above, refers to any flights designated as Group 2 Non-Routine flight operations as defined by the FAA in Supplement to InFO 08032 dated May 16, 2008, in which such tests are required.

**1-B-2-b** On a flight covered by Section 1-B-2(i) above, where one or more diagnostic test is required, engineering or test pilots not on the United Pilots Seniority List may continue to fly the aircraft following such diagnostic test(s) to any location the Company deems appropriate and the Company will not be required to FBO a line crew for any such flight. Once the test flight is complete and the aircraft has landed, further repositioning of the airplane by engineering or test pilot crews will require the Company to FBO a line crew for any such flight.

**1-B-2-c** If the Company assigns engineering or test pilots not on the United Pilots Seniority List to conduct one or more diagnostic test, pursuant to Section 1-B-2(i) above, in order to determine if any aircraft system is discrepant (i.e. operating outside of the range of acceptable tolerance), the Company is required to FBO a line crew if (1) there was no indication before the diagnostic test(s) was conducted that any aircraft system may be discrepant, and (2) the aircraft does not take off and land at the same facility, even if the test is deemed necessary by a Company representative authorized to order such diagnostic tests. However, the Company is not required to FBO a line crew when such diagnostic tests are performed following maintenance on an aircraft to verify there are no discrepant aircraft systems per the General Maintenance Manual.

**1-B-2-d** The Association shall be provided reports on at least a monthly basis of flights flown by engineering or test pilots conducted under Section 1-B-2(i) above. These reports will contain flight information and identify specific aircraft issues requiring the test flight. The Company will provide ALPA access necessary to verify pilots assigned to each such flight.

**1-B-3** Pilot Training

Neither the Company nor a Company Affiliate shall enter into any agreement or arrangement with any person who is not employed by the Company to conduct or supervise United training or to

utilize United training facilities to train other pilots, including without limitation all United Pilot training historically performed at the Pilot Training Centers, except that the Company may:

**1-B-3-a** Use retired or disability retired United pilots who perform the present duties of a flight technical instructor in the Pilot Training Centers as consultants to the Company while under the Company's supervision;

**1-B-3-b** Permit aircraft manufacturers or other qualified organizations to conduct initial training of United flight training personnel on new aircraft Equipment types;

**1-B-3-c** Sell its training services to third parties using United Pilot instructors, provided that such services are not used for the training of pilots to operate aircraft for any air carrier during a labor dispute; or

**1-B-3-d** Dry lease training assets to another airline, FAR Part 142 certificate holder, aerospace company or governmental agency to perform training for pilots provided that such assets are not used for the training of pilots to operate aircraft for any air carrier during a labor dispute.

## 1-C    Code Sharing, Marketing, Ownership and Other Arrangements

Except as provided in Sections 1-C-1, 1-C-2, and 1-C-3, neither the Company nor a Company Affiliate shall enter into any agreement or arrangement that permits any other air carrier to conduct commercial flight operations under the United trade name, brand, logo, trademarks, service marks, or aircraft livery, or any Designator Code currently or in the future owned or used by the Company or a Company Affiliate.

**1-C-1** United Express Flying

**1-C-1-a** The Company or a Company Affiliate may enter into agreements with other air carriers to conduct United Express Flying only in accordance with Section 1-C-1.  "United Express Flight" or "United Express Flying" means a Flight or Flights by a Domestic Air Carrier or Foreign Air Carrier that satisfies all of the following four (4) criteria: i) in Regional Aircraft, ii) utilizing an air carrier operating certificate other than the Company's, iii) conducted using the Company's Designator Code and the United Express or similar brand or pursuant to a Revenue Share Agreement, and iv) operating in Markets within the United States and Territories or between the United States and Territories and Foreign Airports or between Foreign Airports, except that "United Express Flight" or "United Express Flying" does not include Flights or flying conducted by an air carrier pursuant to Section 1-C-2.

**1-C-1-a-(1)** Prior to January 1, 2014, United Express Carriers may operate United Express Flying under the limitations of Sections 1-K-10 and 1-K-22 of the 2003 Agreement between United Airlines and the Air Line Pilots Association (the "2003 United/ALPA CBA") and the provisions of Sections 1-C-1-b through 1-C-1-f, 1-C-1-i and 1-C-1-j.

**1-C-1-a-(2)** On or after January 1, 2014 United Express Carriers may operate United Express Flying under the following limitations:

**1-C-1-a-(2)-(a)** 37-Seat Turboprop Aircraft; and

**1-C-1-a-(2)-(b)** 50-Seat Aircraft, provided that such aircraft do not number more than ninety percent (90%) of the number of single aisle aircraft in the Company Fleet; and

**1-C-1-a-(2)-(c)** Up to a total of 255 76-Seat Aircraft plus 70-Seat Aircraft ("76/70-Seat Aircraft"), of which up to 130 may be 76-Seat Aircraft, and then, on or after January 1, 2016, up to 153 76-Seat Aircraft.

**1-C-1-b** At least eighty percent (80%) of all United Express Flights each month shall be under 900 statute miles.

**1-C-1-c** The Company or a Company Affiliate may create, acquire, Control, manage, take an Equity interest in, enter into Code Share Agreements with, or sell, lease or transfer aircraft to United Express Carriers that comply with the provisions of Section 1-C-1, without the flight operations of such air carrier being considered Company Flying or the aircraft of such air carrier being considered Company Aircraft.

**1-C-1-d** Hubs

In any Rolling Twelve-Month Period, the number of block hours of United Express Flying operated by United Express Carriers as a group non-stop between current or future Company Hubs may not exceed five percent (5%) of all United Express Flying as a percentage of the total block hours of United Express Flying. A pair of Flights by a United Express Carrier operated under a single flight number in which one Flight is scheduled to originate at a Company Hub and the second Flight is scheduled to terminate at a second Company Hub shall be included within the five percent (5%) limitation, unless the Company imposes an IATA Standard Schedules Information Manual Type "A" Traffic Restriction Code on the through itinerary that shall suppress the display of such itinerary.

**1-C-1-e** Connecting Operations

United Express Carriers as a group shall Schedule at least ninety percent (90%) of their United Express Flying Non-Stops into or out of the following airports: IAD, DCA, MIA, LGA, EWR, JFK, ORD, DEN, LAX, SFO, SEA, BOS, PDX, PHX, LAS, SJC, SAN, IAH, CLE, GUM, any airport within thirty (30) statute miles of any of the foregoing, any other airport with fifty (50) or more scheduled daily departures of Company Flying, and any other airport that the parties later agree to add to this list. Up to five percent (5%) of United Express Flying flights may be applied toward satisfying this requirement even if such flights include multiple stops, as long as such flights i) originate or terminate at one of the foregoing airports, ii) maintain a single flight number on a single aircraft for all the legs of such flight to or from such airport, and iii) operate with scheduled intermediate stops of less than two (2) hours.

**1-C-1-f** Scheduled Aircraft Block Hours of United Express Flying as Percentage of Block Hours of Company Flying on Single-Aisle Aircraft

**1-C-1-f-(1)** In any Rolling Twelve-Month Period ending the first full calendar month following date of signing of this Agreement or later, the Company shall not Schedule or permit the Scheduling of aircraft block hours of United Express Flying (excluding block hours operated by 37-Seat Turboprop Aircraft) exceeding the maximum percentage of Scheduled aircraft block hours of Company Flying on single-aisle Company Aircraft ("Max. % of UAXBH to SBH") set forth in the following chart. Cells 1 to 8 state the number of 76-Seat Aircraft operated in United Express Flying (cells 2 through 8 show an increase in the

number of such 76-Seat Aircraft if added under Section 1-C-1-g).  Cells 9 through 16 state the Max. % of UAXBH to SBH that the Company must maintain based on the number of 76-Seat Aircraft in cells 1 through 8.  The measurement for the twelve (12) months in any Rolling Twelve-Month Period shall be made on a weighted basis by the number of 76-Seat Aircraft in United Express Flying in each month.

| Number of 76-Seat Aircraft Operated In United Express Flying | | Max. % of UAXBH to SBH | |
|---|---|---|---|
| 1. | Zero to 153 | 9. | 120% |
| 2. | 154-163 | 10. | 111% |
| 3. | 164-173 | 11. | 104% |
| 4. | 174-183 | 12. | 97% |
| 5. | 184-193 | 13. | 90% |
| 6. | 194-203 | 14. | 83% |
| 7. | 204-213 | 15. | 76% |
| 8. | 214-223 | 16. | 68% |

**1-C-1-f-(2)** The Company shall be excused from compliance with Section 1-C-1-f-(1) for the period of time that a Circumstance Beyond the Company's Control is the cause of such non-compliance.

**1-C-1-g** Number of 76-Seat Aircraft

If the Company adds New Small Narrowbody aircraft to the Company Fleet, then on or after January 1, 2016, the number of permitted 76-Seat Aircraft may increase from 153 (as permitted under Section 1-C-1-a-(2)-(c)) up to a total of 223 76-Seat Aircraft, and the number of permitted 76/70-Seat Aircraft may increase from 255 (as permitted under Section 1-C-1-a-(2)-(c)) up to a total of 325 76/70-Seat Aircraft, except that once the number of 76/70-Seat Aircraft exceeds 255, then the number of 70-Seat Aircraft may not be more than 102.  76-Seat Aircraft (above 153 such Aircraft) may be added on a one 76-Seat Aircraft for each one and one quarter New Small Narrowbody Aircraft (1:1.25) ratio (rounded to the closest integer).  In addition, in the event more than 153 76-Seat Aircraft are in United Express Flying, the Company shall remove from United Express Flying a number of 50-Seat Aircraft determined as follows:

1. "FSFC" is the number of 50-Seat Aircraft in United Express Flying on the date that the 154th 76-Seat Aircraft enters United Express Flying.

2. Subtract 125 from FSFC.

3. Divide the number resulting from step 2 by seventy (70). This results in a factor "X" rounded to the second decimal place.

4. For each 76-Seat Aircraft added to United Express Flying above 153, remove from United Express Flying a number of 50-Seat Aircraft no less than X, with the resulting number of 50-Seat Aircraft to be removed, rounded to the closest integer.

5. Example 1: If the number of 50-Seat Aircraft in United Express Flying is 334, then FSFC-125 equals 209; when 209 is divided by seventy (70), then X = 2.99

6. Example 2: If the number of 50-Seat Aircraft in United Express Flying is 488, then FSFC-125 equals 363; when 363 is divided by seventy (70), then X = 5.19.

For the phrase "rounded to the closest integer," in step 4, the values .1 to .4 shall be rounded down to the next lower whole number and the values .5 to .9 shall be rounded up to the next higher whole number.

**1-C-1-g-(1)** If on January 1, 2016, or any succeeding January 1 thereafter, the number of 50-Seat Aircraft in United Express Flying exceeds the maximum permitted number, the Company shall require United Express Carriers that engage in United Express Flying to suspend or cease operations on a sufficient number of 50-Seat Aircraft or 76-Seat Aircraft to comply with these requirements within sixty (60) days and to remain in compliance thereafter. The Company shall be excused from compliance with the provisions of this Section 1-C-1-g-(1) in the event a Circumstance Beyond the Company's Control is the cause of such non-compliance

**1-C-1-h** Effect of Furlough

If a Pilot on the Seniority List with an employment date prior to January 23, 2016 is placed on furlough, the Company shall convert all 76-Seat Aircraft for operation as 70-Seat Aircraft. The number of such aircraft shall continue to be limited as though they were being operated as 76-Seat Aircraft. The Company may again commence operating such Aircraft as 76-Seat Aircraft effective on the date that the most junior Pilot protected by the first sentence of this Section 1-C-1-h is recalled from furlough.

**1-C-1-i** United Express Carrier Branding

Aircraft operated in United Express Flying may bear the Company's logo or aircraft livery only if such aircraft bear the name United Express or similar name connoting a connection with United Airlines (but such United Express Flying operations may not be conducted under the name United Airlines or other names used by the Company).

**1-C-1-j** Hiring of Furloughed Pilots

Pursuant to Letter of Agreement 12-09, no Domestic United Express Carrier which does not comply with the requirements of Letter of Agreement 12-09 with respect to the hiring of furloughed United Pilots may operate 70-Seat Aircraft or 76-Seat Aircraft.

**1-C-2** Domestic Code Share Agreements

The Company or a Company Affiliate may enter into or maintain a Code Sharing Agreement with Domestic Code Share Carriers that permit such carriers to apply the Company's Designator Code to their operations only in accordance with this Section 1-C-2.  For purposes of this Section 1-C-2, Flights conducted by Affiliates of the Domestic Code Share Carrier or United Express Carriers under agreement with and under the Designator Code of the Domestic Air Carrier shall be considered Flights conducted by that Domestic Air Carrier to the extent they are conducted pursuant to the applicable Domestic Code Sharing Agreement.

**1-C-2-a** The Company may maintain the existing Domestic Code Sharing Agreements with Great Lakes, Gulfstream/Silver Airways, and Cape Air, provided those Domestic Air Carriers only operate Regional Aircraft.

**1-C-2-b** The Company may enter into or maintain Domestic Code Sharing Agreements for flight operations between airports within Alaska and Hawaii.

**1-C-2-c** The Company may maintain and enter into additional Domestic Code Sharing Agreements with Domestic Code Share Carriers subject to the following restrictions:

**1-C-2-c-(1)** Hub to Hub Flights

The Company shall not permit Domestic Code Share Flying between Company Hubs or to or from a Company Hub unless such Flying is between a Company Hub and the applicable Domestic Code Share Carrier's Hub.  The number of ASMs of code sharing flying conducted by the Domestic Code Share Carrier from the Company's Hubs to the Domestic Code Share Carrier's Hubs cannot exceed the Domestic Code Share Carrier Hub ASM Ratio (as defined below):

For each Domestic Code Share Carrier, a ratio (the "Domestic Code Share Carrier Hub ASM Ratio") will be determined by dividing the number of ASMs of all Hub to Hub Flights (i.e., between the applicable Domestic Code Share Carrier's Hubs and Company Hubs) scheduled to be operated by such Domestic Code Share Carrier on aircraft other than Regional Aircraft by the number of domestic ASMs of all Hub to Hub Flights scheduled to be operated by the Company during the twelve (12) full calendar months immediately prior to the effective date of the Domestic Code Sharing Agreement with the Domestic Code Share Carrier.  The last day of the twelve-month period shall be the "Ratio Date" with respect to such Domestic Code Share Carrier.

For each Rolling Twelve-Month Period measured each calendar month (with the first measurement occurring the twelfth (12th) calendar month after the Ratio Date), the ratio between the number of domestic ASMs of Hub to Hub Flights scheduled by the Domestic Code Share Carrier bearing the Company's Designator Code and the number of ASMs of Hub to Hub Flights scheduled by the Company bearing the Domestic Code Share Carrier's designator code (the "Schedule Ratio") shall not exceed 120% of the Domestic Code Share Carrier Hub ASM Ratio.

**1-C-2-c-(2)** System Flights

The number of ASMs in flights conducted by the Domestic Code Share Carrier carrying the Company's code may not exceed the Domestic Code Share Carrier ASM Ratio (as defined below):

For each Domestic Code Share Carrier, a ratio (the "Domestic Code Share Carrier ASM Ratio") will be determined by dividing the number of ASMs scheduled to be operated by the Domestic Code Share Carrier in aircraft other than Regional Aircraft by the number of ASMs of all flights scheduled to be operated by the Company during the twelve (12) full calendar months immediately prior to the effective date of the Code Share Agreement with the Domestic Code Share Carrier. The last day of the applicable twelve (12) month period shall be the "Ratio Date" with respect to such Domestic Code Share Carrier.

For each Rolling Twelve-Month Period measured each calendar month (with the first (1st) measurement occurring the twelfth (12th) calendar month after the Ratio Date), the ratio between the number of ASMs of Domestic Code Sharing Agreement Flights scheduled by the Domestic Code Share Carrier bearing the Company's designator code in aircraft other than Regional Aircraft and the number of ASMs of Domestic Code Sharing Agreement Flights scheduled by the Company bearing the Domestic Code Share Carrier's designator code (the "Domestic Code Share Carrier Schedule Ratio") shall not exceed 115% of the Domestic Code Share Carrier ASM Ratio. For example, if the Domestic Code Share Carrier ASM Ratio is 1.5 (i.e., the Domestic Code Share Carrier had fifty percent (50%) more scheduled ASMs in aircraft other than Regional Aircraft than the Company in the measurement period), then the number of ASMs scheduled to be operated by the Domestic Code Share Carrier bearing the Company's Designator Code in aircraft other than Regional Aircraft may not be more than 1.725 times the number of ASMs scheduled to be operated by the Company bearing the Domestic Code Share Carrier's Designator Code. As a further example, if the Domestic Code Share Carrier ASM Ratio is 0.5 (i.e., the Domestic Code Share Carrier has one-half (1/2) of the scheduled ASMs of the Company in the measurement period in aircraft other than Regional Aircraft), then the number of ASMs scheduled to be operated by the Domestic Code Share Carrier bearing the Company's Designator Code in such aircraft may not be more than 0.575 times the number of ASMs scheduled to be operated by the Company bearing the Domestic Code Share Carrier's Designator Code.

The provisions of this Section 1-C-2-c-(2) shall have been satisfied in connection with a Domestic Code Sharing Agreement with a Domestic Code Share Carrier that at the time operates fewer than one-half (1/2) of the number of ASMs operated by the Company, if the number of ASMs of Domestic Code Sharing Agreement Flights scheduled by the Domestic Code Share Carrier bearing the Company's Designator Code equals no more than 125% of the number of ASMs of Domestic Code Share Flights scheduled by the Company bearing the Domestic Code Share Carrier's Designator Code.

**1-C-2-d** Identity

The Company may conduct joint marketing efforts with Domestic Air Carriers with which it is engaging in Domestic Code Share Flying but shall maintain a primary operating, corporate, and marketing identity (including an independent and separate name, trade name, logo,

aircraft livery, trademarks, and service marks), separate and apart from the identity of the Domestic Code Share Carriers. Nonetheless, the Company may operate aircraft bearing the logo of the alliance in which the Company participates (in addition to and smaller than the Company's logo) and may market its Flights using the alliance marketing identity in addition to, but less prominent than, its own. Further, the Company may operate aircraft up to three percent (3%) of the Company fleet bearing the livery of the alliance in which the Company participates, including the names, colors, and logos of all of the alliance's airlines.

**1-C-3** Foreign Air Carrier Code Share Agreements

In any Rolling Twelve-Month Period the Company shall not Schedule or permit the Scheduling of aggregate ASMs of Foreign Code Share Flying operated by any Foreign Air Carrier that is not party to a Revenue Share Agreement with the Company or Company Affiliate between the United States and Territories and a Foreign Airport exceeding 125% of the aggregate Scheduled ASMs of Company Flying bearing that Foreign Air Carrier's Designator Code. Further, the Company or a Company Affiliate may enter into or maintain Code Share Agreements and Revenue Share Agreements with Foreign Air Carriers that permit such carriers to utilize the Company's Designator Code on such carriers' Flights between the United States and Territories and Foreign Airports or between two Foreign Airports ("Foreign Code Share Flying") only in accordance with Sections 1-C-3-a through 1-C-3-c. For clarification purposes, the first sentence of Section 1-C-3 applies to a Foreign Code Share Agreement where there is no Revenue Share Agreement; Sections 1-C-3-a, 1-C-3-b-(1), and 1-C-3-b-(2) apply to Flights operated under either a Foreign Code Share Agreement or a Revenue Share Agreement with a Foreign Air Carrier, and Sections 1-C-3-b-(3) and 1-C-3-c apply where the Flights are operated under both a Foreign Code Share Agreement and a Revenue Share Agreement with the applicable Foreign Air Carrier.

**1-C-3-a** Geographical Limits

The Company shall not Schedule or permit the Scheduling of Foreign Code Share Flying from or to a Company Hub unless the other airport in the Market (i) is a Hub of the applicable Foreign Air Carrier (including such carrier's Foreign Air Carrier Affiliates) outside the United States or (ii) is another Foreign Airport in a country which contains a Hub of such Foreign Air Carrier (including such carrier's Foreign Air Carrier Affiliates).

**1-C-3-b** Flying Ratios

**1-C-3-b-(1)** For each Foreign Air Carrier which is a party to a Code Share Agreement, with respect to International Routes on which the Company has scheduled service, a differential (the "Foreign Air Carrier Flight Differential") will be determined by comparing the average number of scheduled Flights per day operated on an International Route by the Company with the average number of scheduled Flights per day operated on the same International Route by the Foreign Air Carrier (including Flights operated by Affiliates of such Foreign Air Carrier) either:

**1-C-3-b-(1)-(a)** During the twelve (12) full calendar months immediately prior to the effective date of this Agreement (if the Foreign Air Carrier was a party to a Code Share Agreement on the effective date of this Agreement), or

**1-C-3-b-(1)-(b)** During the twelve (12) full calendar months immediately prior to the effective date of the Code Share Agreement with the Foreign Air Carrier (if the Foreign Air Carrier was not a party to a Code Share Agreement on the effective date of this Agreement).

**1-C-3-b-(2)** The Company may not place its Designator Code on any Foreign Air Carrier Flight on the shared International Route which would exceed the Differential number of Flights by more than two (2) (also accounting for the number of such Flights of the Company in this Market bearing the Foreign Air Carrier's Designator Code and accounting for the number of Flights of the Affiliates of the Foreign Air Carrier in this Market).

**1-C-3-b-(2)-(a)** For example, if the Company had two (2) regularly scheduled daily Flights and the Foreign Air Carrier and its Affiliates had six (6) between EWR and CDG during the applicable twelve-month measurement period in Section 1-C-3-b-(1), the Foreign Air Carrier Flight Differential would be four (4).

**1-C-3-b-(2)-(b)** If during a subsequent Rolling Twelve-Month Period the Company had three (3) flights between EWR and CDG, all with the Foreign Air Carrier's Designator Code, then the Company could place its Designator Code on a maximum of nine (9) of the Foreign Air Carrier Flights between EWR and CDG.  This maximum of nine (9) of the Foreign Air Carrier Flights between EWR and CDG in this example is derived by adding 4 (the Foreign Air Carrier Flight Differential) plus 3 (the number of Company Flights bearing the Foreign Air Carrier's Designator Code) plus two (2) (the Section 1-C-3-b-(2) limit).

**1-C-3-b-(3)** In the event the Company or a Company Affiliate enters into or maintains a Revenue Share Agreement with one or more Foreign Air Carriers, the Scheduled block hours of Company Flying between the United States and Territories and the foreign country or countries covered by the applicable Revenue Share Agreement in each Rolling Twelve-Month Period shall be not less than ninety percent (90%) of the Scheduled block hours of Company Flying between the United States and Territories and foreign countries covered by the applicable Revenue Share Agreement either:

**1-C-3-b-(3)-(a)** During the twelve (12) full calendar months immediately prior to the effective date of this Agreement (if the Foreign Air Carrier was a party to a Revenue Share Agreement on the effective date of this Agreement) (a "Base Period"), or

**1-C-3-b-(3)-(b)** During the twelve (12) full calendar months immediately prior to the effective date of the Revenue Share Agreement with the Foreign Air Carrier (if the Foreign Air Carrier was not a party to a Revenue Share Agreement on the effective date of this Agreement) (a "Base Period").

**1-C-3-b-(4)** If the aggregate of Scheduled block hours flown between the United States and Territories and Foreign Airports within the geographic scope of the applicable Revenue Share Agreement by all Domestic Air Carriers (excluding Company Flying) decreases during a Rolling Twelve-Month Period in comparison to the applicable Base Period, the percentage required by Section 1-C-3-b-(3) for that Rolling Twelve-Month Period shall be

reduced by fifty percent (50%) of the percentage of that decrease in Scheduled block hours.

**1-C-3-c** Revenue Limitations Under Revenue Share Agreements with Foreign Air Carriers

Measured on a Rolling Twelve-Month basis for each Revenue Share Agreement, the Company's revenue from that Revenue Share Agreement associated with Flights that are 1) operated by the Company between the United States and Territories and Foreign Airports or between Foreign Airports, and 2) covered by the applicable Revenue Share Agreement, shall not exceed 130% of the total revenue onboard Company Flights that are 1) operated by the Company between the United States and Territories and Foreign Airports or between Foreign Airports, and 2) covered by the applicable Revenue Share Agreement. For purposes of this provision, total revenue onboard Company Flights equals the prorated segment passenger revenue as recognized by the Company's business revenue accounting systems used in the Company's public reports.

For example, if, during a Rolling Twelve-Month period, 1) total revenue onboard Company Flights between the United States and Foreign Airports or between Foreign Airports covered by a Revenue Share Agreement equals $5.872B, and 2) the Company receives an additional $100M under the applicable Revenue Share Agreement associated with these same Flights (meaning that the Company receives total revenue under the Revenue Share Agreement associated with these Flights of $5.972B), then 3) the percentage of the Company's revenue associated with these Flights under the Revenue Share Agreement ($5.972B) would be 101.7% of the Company's onboard revenue for these Flights ($5.872B), because $5.972B divided by $5.872B results in 101.7%. Since this 101.7% would be smaller than the 130% limit, the Company in this example would be in compliance with Section 1-C-3-c.

As another example: if, during a Rolling Twelve-Month period, 1) there are no Company Flights covered by a Revenue Share Agreement, meaning that total revenue onboard Company Flights under this Revenue Share Agreement equals $0, then 2) the Company may not receive any revenue under the applicable Revenue Share Agreement, because the Company receipt of such revenue would exceed the 130% limit in Section 1-C-3-c.

**1-C-3-d** Identity

The Company shall maintain a separate identity from Foreign Air Carriers engaged in Foreign Code Share Flying to the same extent as required in Section 1-C-2-d in regard to Domestic Code Share Carriers.

**1-C-3-e** Cabotage

The Company shall join the Association in strongly opposing any changes in U.S. law that would permit Foreign Air Carriers to engage in cabotage. If U.S. law is changed to permit cabotage, the Company shall not allow its Designator Code to be used on Flights of Foreign Air Carriers carrying local revenue passengers or cargo or mail traffic between airports within the United States and Territories.

**1-C-3-f** Control

Without limitation to any other restriction set forth in this Section 1 and only as a clarification regarding limits on Company operations under this Section 1, the Company shall not continue any portion of an existing agreement or arrangement, or enter into any new agreement or arrangement, for creation of a new Foreign Air Carrier over which the Company has Control, and which operates Flights between the United States and Territories and any Foreign Airport (e.g., Aer Lingus joint venture).

**1-C-4** Block Space

The Company may enter into block space arrangements with other carriers (i.e., the advance purchase or reservation of blocks of seats on other carriers for resale by the Company) only:

**1-C-4-a** On flights which carry the Company's Designator Code pursuant to Sections 1-C-1, 1-C-2 and 1-C-3, provided that the right to enter into block space arrangements does not override any restrictions in any of those Sections and may only be implemented to the extent consistent with such Sections;

**1-C-4-b** On a limited number of occasions where United Vacations or Mileage Plus from time to time purchases block seats in order to provide connecting service as part of group vacation packages where such service or seats on such service are not available from the Company; or

**1-C-4-c** On other occasions, limited in number and consistent with the Company's limited practices as of the effective date of this Agreement, where the Company from time to time purchases seats for connecting passengers over routes on which the Company does not maintain operating authority.

**1-C-5** Enforcement

**1-C-5-a** If in any three (3) consecutive calendar month period following the applicable date, the Flight Differential, block hour percentage, or ASM ratio requirements of Sections 1-C-2-c-(1), 1-C-2-c-(2), 1-C-3, 1-C-3-b-(2), or 1-C-3-b-(3) are not satisfied, then the Company shall promptly take any of the following actions as applicable within ninety (90) days of the date the Association notifies the Company that it has not satisfied the applicable requirement:

**1-C-5-a-(1)** Add or delete the Company Designator Code to or from one or more Flights of the applicable air carrier(s), or

**1-C-5-a-(2)** Add or delete the applicable air carrier's Designator Code to or from the applicable Company Flights, or

**1-C-5-a-(3)** Add Company Flying.

**1-C-5-b** The Company shall be excused from compliance with Sections 1-C-2-c-(1), 1-C-2-c-(2), 1-C-3, 1-C-3-b-(2), or 1-C-3-b-(3) for the period of time that a Circumstance Beyond the Company's Control is the cause of such non-compliance.

**1-C-5-c** If the Company, a Domestic Code Share Carrier or a Foreign Air Carrier merges with another air carrier so as to form a single carrier with a single pilot seniority list and a single pilot collective bargaining agreement, the ASM Ratios, the Hub ASM Ratios and the Foreign Air Carrier Flight Differential provided for in Sections 1-C-2-c-(1), 1-C-2-c-(2), 1-C-3, 1-C-3-b-(2), or 1-C-3-b-(3), shall be appropriately adjusted by adding the relevant numbers of the other

air carrier party to the merger (and any flights of Domestic Code Share Flying scheduled to be operated by the Domestic Code Share Carrier in aircraft other than Regional Aircraft whose ASMs are counted as Domestic Code Share Carrier ASMs pursuant to Sections 1-C-2-c-(1) or 1-C-2-c-(2)) to the relevant numbers of the Company or the Domestic Code Share Carrier, as the case may be, with such numbers to be measured during the twelve (12) full calendar months immediately prior to the effective date of the merger.  In connection with such adjustment, in addition to the other carrier's Hubs and Company Hubs, each Hub of the air carrier party to the merger shall be considered a Company Hub or a Hub of the other carrier, as the case may be, if such air carrier scheduled during any month in such six month period an average of fifty (50) or more daily departures therefrom.

## 1-D    Successorship

**1-D-1** Successorship Transactions

The Company and its Parent shall require any successor, assign, assignee, transferee, administrator, executor and/or trustee of the Company or its Parent (a "Successor") resulting from the transfer (in a single transaction or in multistep transactions) to the Successor of the ownership of fifty percent (50%) or more of the Equity of the Company or Parent or fifty percent (50%) or more of the value of the assets of the Company, or Control of the Company (a "Successorship Transaction"), to continue to recognize and treat with the Association as the representative of the United Pilots, to employ or cause the Company or Successor, as applicable, to continue to employ the United Pilots in accordance with the provisions of the Agreement and to assume and be bound by the Agreement, and, if the Successor is an air carrier or an Entity that Controls an air carrier, to abide by the Merger Transaction provision set forth in Section 1-D-4.

**1-D-2** Successorship Agreements.

The Company and its Parent shall not consummate a Successorship Transaction unless the potential Successor agrees in writing, as an irrevocable condition of the Successorship Transaction, to assume and be bound by the Agreement, to recognize the Association as the representative of the Company's pilots, to guarantee that the pilots on the United Pilots' System Seniority List shall be employed by the Successor in accordance with the provisions of the Agreement and, if the Successor is an air carrier or an Entity that Controls an air carrier, to abide by the Merger Transaction provisions set forth in Section 1-D-4.

**1-D-3** Competing Proposal

In the event the Company or its Parent receives a proposal (a "Proposal") for a transaction which would result in a Successor if completed, and the Company or its Parent determines to pursue or facilitate the Proposal, the Company or its Parent shall in good faith seek to provide the Association with the opportunity to make a competing Proposal at such time and under such circumstances as the Board of Directors of UCH or the Company reasonably determines to be consistent with its or their fiduciary duties.

**1-D-4** Merger Transactions

If the acquiring Entity in a Successorship Transaction is an air carrier or an Entity that Controls an air carrier or if the Company or its Parent acquires Control of or merges with another air carrier

or Entity that Controls an air carrier other than a United Express Carrier (any of the foregoing, a "Merger Transaction"), the following provisions shall apply to the acquiring or acquired carrier, as applicable (the "Other Air Carrier") and the Company (collectively, the "Carrier Parties").

**1-D-4-a** Following announcement of a Merger Transaction, the Carrier Parties shall promptly commence negotiations with the Association and the collective bargaining representative, if any, of pilots employed by the Other Air Carrier (collectively, the "Union Parties") for a Transition and Process Agreement that shall include the provisions in Sections 1-D-4-a-(1) through 1-D-4-a-(10) (unless all parties to the negotiation mutually agree otherwise), and such other terms as the parties agree upon. However, unless the parties agree otherwise, the United Pilots shall receive the following protections until the Operational Merger Date or the parties shall take the following actions, in either case whether or not the parties complete a Transition and Process Agreement.

**1-D-4-a-(1)** The flight operations of the Company and the Other Air Carrier shall remain separated, with pilots employed by each carrier operating each carrier's pre-merger aircraft under the existing collective bargaining agreement(s) and seniority lists, until the implementation of an integrated seniority list pursuant to Section 1-D-4-a-(2) and a single collective bargaining agreement (the "Operational Merger Date").

**1-D-4-a-(2)** The Carrier Parties shall provide the pilots employed by the Company and the Other Air Carrier with the seniority integration rights governed by Association Merger Policy if both pre-transaction pilot groups are represented by the Association and by the McCaskill-Bond Amendment and Sections 3 and 13 of the Allegheny-Mohawk Labor Protective Provisions if both pilot groups are not so represented. The Association agrees that it shall promptly invoke such procedures, provided that such procedures need not be completed and a seniority list need not be established until completion of a single collective bargaining agreement.

**1-D-4-a-(3)** The Association shall promptly initiate proceedings before the National Mediation Board ("NMB") for a determination that the Company and the Other Air Carrier constitute a single carrier for purposes of collective bargaining under the Railway Labor Act and for designation of the post-merger representative of the combined pilot group.

**1-D-4-a-(4)** The Carrier Parties shall promptly begin negotiations with the representative(s) of both carrier's pilots (i.e., the Union Parties prior to an NMB decision and the single collective bargaining representative certified by the NMB thereafter) for a single collective bargaining agreement governing the merged operations of the carrier with such negotiations to take place under Section 6 of the Railway Labor Act (i) if the Agreement or the collective bargaining agreement or agreements of the other Air Carrier or Air Carriers in the Air Carrier Transaction is then amendable or becomes amendable or (ii) if not, then at the option of either the Company or the Association. Until the effective date of a single collective bargaining agreement or as otherwise agreed by the Association, the Agreement shall continue to apply to the United Pilots.

**1-D-4-a-(5)** The Carrier Parties shall forbear from interchanging or transferring pilots or aircraft between them.

**1-D-4-a-(6)** The Carrier Parties shall assure that until the Operational Merger Date the United Pilots shall have the right to operate all aircraft on hand at the Company, all aircraft on firm order to the Company or an Affiliate of the Company (other than an Affiliate engaged only in United Express Flying) and all aircraft acquired by the Company after the public announcement of the Air Carrier Transaction (other than aircraft acquired as a result of the Air Carrier Transaction); provided, however, that nothing herein shall be construed to prevent fleet reductions which the Company can demonstrate are attributable to the retirement of existing aircraft in the normal course of business, to casualty loss or to economic reasons not related to the Air Carrier Transaction.

**1-D-4-a-(7)** The Carrier Parties shall assure that, in each Rolling Twelve-Month Period until the effective date of the integrated pilot seniority list, the ratios of Scheduled aircraft block hours of Company Flying (i) on single-aisle aircraft, and (ii) on twin-aisle aircraft, to Scheduled aircraft block hours operated by each air carrier in the Air Carrier Transaction (x) on single-aisle aircraft, and (y) on twin-aisle aircraft, respectively, shall in each case equal or exceed ninety-five percent (95%) of the same ratio determined for the period of twelve (12) consecutive calendar months immediately preceding the closing of the Air Carrier Transaction. The Company shall be excused from compliance with such minimum Scheduled aircraft block hours for the period of time that either a Circumstance Beyond the Company's Control or the retirement of aircraft in the normal course of business as scheduled before the agreement that led to the Air Carrier Transaction causes the Company to reduce or cancel service, or a governmental agency requirement causes the Company to reduce or cancel service as a condition of approval of the Air Carrier Transaction, and that the listed event is the cause of such non-compliance.

**1-D-4-a-(8)** The Carrier Parties shall assure that no United Pilot as of the date of the announcement of the proposed Air Carrier Transaction shall be placed on furlough from that date until a date not less than one (1) year following the Operational Merger Date.

**1-D-4-a-(9)** The Carrier Parties shall meet promptly with the Association to negotiate the other possible fence, protective, and transition terms to be in effect until the Operational Merger Date. The Parties shall work together to integrate marketing, reservations systems and livery, to take the steps necessary to secure approval from the Federal Aviation Administration ("FAA") for operation under a single operating certificate, and to take such other steps as will foster their mutual goal of achieving a Complete Operational Merger (meaning, the operation of the two carriers under a single FAA operating certificate, a single transportation system under the Railway Labor Act ("RLA"), and under a joint collective bargaining agreement with an integrated pilot seniority list) at the earliest reasonable time.

**1-D-4-a-(10)** The Operational Merger Date shall be no later than ninety (90) days following negotiation and ratification, if necessary, of a single collective bargaining agreement and acceptance by the Carrier Parties of the integrated seniority list.

**1-D-4-b** The Carrier Parties shall accept the outcome of the seniority list integration process set forth in Section 1-D-4-a-(2), provided that, solely with regard to a seniority list integrated under Association policy, none of the attendant conditions and restrictions therein: i) require

a system flush whereby pilots may displace any other pilots from the latter's position; ii) require a pilot to be compensated for flying not performed (e.g., differential pay for a position not flown); iii) require the cancellation of a vacancy or displacement award for a pilot who has commenced training for that position by attending ground school at the training facility; iv) significantly increase the Company's costs; or v) provide that a pilot shall be displaced from his position by a pilot of the other pre-merger pilot group solely as the result of the implementation of, or the expiration of, any condition or restriction.

## 1-E     Other Labor Protective Provisions

If the Company disposes of or transfers to an air carrier (the "Transferee") (by sale, lease or other transaction, whether directly or indirectly through an Affiliate or lessor or vendor to the Transferee) either (i) seventy-five percent (75%) or more of the gates and other facilities used in Company Flying at any Company Hub or (ii) aircraft or route authority which produced fifteen percent (15%) or more of the Company's operating revenues, block hours, or ASMs during the twelve (12) months immediately prior to the date of the agreement to transfer such aircraft or route authority (the "Transaction Date"), net of revenues, block hours or ASMs that are produced by aircraft or route authority that were placed into service during the same period (any such transfer, a "Substantial Asset Sale"), then:

**1-E-1** Offer of Employment to United Pilots.

The Company shall require the Transferee to offer pilot employment to eligible United Pilots. The eligibility criteria shall be determined by agreement between the Company and the Association and shall be reasonably related to the assets transferred, the interests of the United Pilots and the Company, and the nature and timing of the transaction among other issues. If the Association and the Company are unable to agree upon eligibility criteria that are consistent with the foregoing considerations, the System Board of Adjustment shall determine such eligibility criteria pursuant to the expedited procedures set forth in Section 1-K-1 (the "Transferring Pilots"). The number of pilot employment opportunities for Transferring Pilots shall be, as measured in the twelve (12) months prior to the Transaction Date, the sum of (i) the average monthly pilot staffing actually utilized in the operation of the aircraft transferred to the Transferee in connection with the Substantial Asset Sale plus (ii) the average monthly pilot staffing actually utilized in the operation of the route authority transferred to the Transferee in connection with the Substantial Asset Sale to the extent such pilot staffing is not included in the calculation of clause (i) above. Offers of employment that are rejected by a United Pilot shall in turn be offered to other United Pilots under the eligibility criteria determined under this Section 1-E-1, until such opportunities have been exhausted.

**1-E-2** Seniority Integration

The Company shall require the Transferee to provide the Transferring Pilots with the seniority integration rights provided in the McCaskill-Bond Statute and Sections 3 and 13 of the Allegheny-Mohawk LPPs except that the integration of the Transferring Pilots into the Transferee's seniority list shall be governed by Association Merger Policy if both pre-transaction pilot groups are represented by the Association. The Company shall require each Transferee to provide the seniority integration rights specified in the preceding sentence in connection with a Substantial

Asset Sale in a written document enforceable against the Transferee by the Association and/or the Transferring Pilots.

## 1-F        Labor Disputes

**1-F-1** The Agreement contains no contractual prohibition whatsoever on the ability of the Association and the United Pilots to honor lawful picket lines.

**1-F-2** The Association and/or the United Pilots are not prohibited from:

**1-F-2-a** Refusing to layover at a struck hotel or other struck facility;

**1-F-2-b** Refusing to deadhead on carriers whose employees are engaged in a lawful strike, as long as alternatives are reasonably available; and

**1-F-2-c** Engaging in a concerted refusal, called by the Association, to perform pilot work or services on flights where the Company, pursuant to an agreement or arrangement with another air carrier, is performing that air carrier's flying in response to a labor dispute and that air carrier's employees are engaged in a lawful strike.

## 1-G        Foreign Ownership and Bases

**1-G-1** The Company shall continue to be a Domestic Air Carrier subject to the Railway Labor Act, as amended.

**1-G-2** The Company shall maintain its world headquarters, executive offices, and offices for senior Flight Operations personnel in the fifty (50) United States.

**1-G-3** In the event the Company opens a Pilot Base outside of the United States and Territories, the Company's Pilots assigned to such Base shall be afforded all rights under this Agreement and the Railway Labor Act.  The Company shall provide notice to the Association and meet and confer regarding a decision to open such a Base prior to posting a bid for vacancies.

## 1-H        Board Seat

**1-H-1** Consistent with the provisions of Article Fourth, Part II of the amended and restated certificate of incorporation of UCH in effect on July 1, 2012 (the "Restated Certificate"), the Association's United Airlines Master Executive Council ("MEC") shall be entitled to elect one director (a "Pilot Director") to the UCH Board of Directors (or a successor corporation solely to the extent specifically set forth in Article Fourth, Part II of the Restated Certificate).  The parties acknowledge and agree that the provisions of Article Fourth, Part II of the Restated Certificate satisfy the requirements of the preceding sentence and that such entitlement shall be subject to all of the terms and conditions set forth in Article Fourth, Part II of the Restated Certificate.

**1-H-2** Nothing in this Section 1-H shall be construed to limit the MEC in establishing its own procedures for the designation, removal and replacement of the Pilot Director without the consent of any other party to the extent permitted by law, provided that such procedures do not conflict with the provisions of the Restated Certificate.

## 1-I        General Furlough Protection

**1-I-1** No Pilot on the Seniority List as of January 23, 2016 shall be placed on furlough on less than ninety (90) days advance written notice.

**1-I-2** No Pilot on the Seniority List as of the date of signing of this Agreement shall be placed on furlough if the staffing at the time of notice or at time of furlough is less than the manpower requirements of Section 8 for any position.

**1-I-3** No Pilot shall be placed on furlough as the result of the Company's acquisition of Control of another air carrier or of another air carrier's acquisition of Control of the Company, commencing on the date of consummation of the agreement resulting in the acquisition of Control and continuing for twenty-four (24) months following the closing of such agreement between the Company and the other air carrier; the protections provided by Section 1-I-3 are separate and independent from the protections provided by Section 1-D-4-a-(8).

**1-I-4** The Company shall be excused from compliance with the provisions of Sections 1-I-1, 1-I-2, and 1-I-3 in the event a Circumstance Beyond the Company's Control is the cause of such noncompliance.

## 1-J      Review Committee

**1-J-1** A standing committee, consisting of two (2) Association representatives and two (2) Company representatives (plus additional representatives if deemed appropriate by the Association and the Company) (the "Related Carrier Review Committee" or "RCRC") shall be maintained by the parties. The RCRC may establish such subcommittees as it deems appropriate. The RCRC and its subcommittees shall meet as often as they deem necessary, but no less than quarterly, in order to implement and monitor compliance with this Section 1.

**1-J-2** The Company shall provide the RCRC, on a monthly basis, (i) all information necessary to monitor and enforce the terms and conditions established in this Section 1, (ii) the information required by Letters of Agreement 03-06 and 04-03; and (iii) advance notice of substantive changes to Revenue Share Agreements. When this information involves proprietary, sensitive or confidential information concerning either the Company or any other carrier, the RCRC shall review such information under a confidentiality agreement with the same terms as the confidentiality agreement currently in effect between the Company and the Association with such modifications, if any, as are acceptable to the Association and the Company.

**1-J-3** The RCRC shall review all new and modified agreements concerning the Company's relationships with other air carriers as governed by this Section 1 in order to ensure compliance with the terms of this Section 1. In reviewing agreements with United Express Carriers, the RCRC shall make such recommendations to the Company as the RCRC deems appropriate for the purpose of strengthening the Company's contractual relationships with United Express Carriers and protecting the Company's feed.

**1-J-4** The parties shall utilize appropriate aspects of the Notice of Proposed Decision Making ("NPDM") procedures currently utilized by the System Schedule Committee in connection with a review of the United Express Carriers aimed at ensuring that all United Express Carriers maintain the highest possible quality assurance and flight safety programs and provide a product that meets the Company's high quality standards.

## 1-K        Remedies

**1-K-1** A grievance filed by the Association alleging a violation of this Section 1 shall, at the request of either party, bypass the initial steps of the grievance process and be submitted and heard on an expedited basis directly before the System Board of Adjustment sitting with a neutral arbitrator. The dispute shall be heard by the System Board of Adjustment no later than thirty (30) days following the submission of the grievance to the System Board and decided no later than thirty (30) days after the record is closed in the hearing, unless the parties agree otherwise in writing.

**1-K-2** If the System Board decides that the Company has violated any part of this Section 1, the System Board shall direct the Company to comply with the Agreement and shall fashion an appropriate remedy for the harm caused by the Company's failure to comply with the Agreement.

## 1-L        Definitions

The following definitions shall apply to the capitalized terms in this Section 1:

**1-L-1** "Affiliate" of Entity A means, any other Entity which directly or indirectly Controls, is Controlled by or is under common Control with Entity A.

**1-L-2** "Circumstance Beyond the Company's Control" includes but is not limited to an act of nature; an ongoing labor dispute; grounding or repossession of a substantial number of aircraft operated by the Company by a government agency or court order; loss or destruction of the Company's aircraft; involuntary reduction in flight operations due either to a governmental action(s)/requirement(s) or to a decrease in available fuel supply or other critical materials for the Company's operations; revocation of a Company operating certificate; war emergency; a terrorist act; or a substantial delay in the delivery of aircraft scheduled for delivery, provided that the applicable occurrence has a material and substantial impact on the Company.  The phrase "Circumstance Beyond the Company's Control" does not include any economic or financial considerations including, but not limited to, the price of fuel, aircraft or other supplies, the cost of labor, the level of revenues, the state of the economy, the financial state of the Company, or the relative profitability or unprofitability of the Company's then-current operations in the absence of the circumstances described in the preceding sentence.

**1-L-3** "Code Share Agreement" means an agreement or arrangement among two (2) or more air carriers or their Affiliates, permitting one (1) of the air carriers to use, in its marketing, reservations, ticketing, and operations, the other air carrier's Designator Code.

**1-L-4** "Company" means United Airlines, Inc.

**1-L-5** "Company Aircraft" includes all aircraft owned or leased by the Company or a Company Affiliate other than Regional Aircraft.  Company Aircraft do not include aircraft that have been sold, leased or transferred.

**1-L-6** "Company Fleet" means Company Aircraft in service or undergoing maintenance, and operational spares.

**1-L-7** "Company Hub" means CLE, DEN, EWR, GUM, IAD, IAH, LAX, ORD, SFO, and SEA (so long as the Company or a Foreign Air Carrier operating under a Revenue Share Agreement with the

Company operates trans-Pacific flights out of SEA), and any other airport identified as a hub in UAL's Annual Report on Form 10-K.

**1-L-8** "Control": Entity A shall be deemed to "Control" Entity B if Entity A, whether directly or indirectly,

> **1-L-8-a** owns securities that constitute, are exercisable for or are exchangeable into fifty percent (50%) or more of (i) Entity B's outstanding common stock or (ii) securities entitled to vote on the election of directors of Entity B; or otherwise owns fifty percent (50%) or more of the Equity of Entity B; or

> **1-L-8-b** maintains the power, right, or authority--by contract or otherwise--to direct, manage or direct the management of all, or substantially all, of Entity B's operations or provides all or substantially all of the controlling management personnel of Entity B; or

> **1-L-8-c** maintains the power, right or authority to appoint or prevent the appointment of a majority of Entity B's Board of Directors or similar governing body; or

> **1-L-8-d** maintains the power, right or authority to appoint a minority of Entity B's Board of Directors or similar governing body, if such minority maintains the power, right or authority to appoint or remove any of Entity B's executive officers or any committee of Entity B's Board of Directors or similar governing body, to approve a material part of Entity B's business or operating plans or to approve a substantial part of Entity B's debt or equity offerings.

**1-L-9** "Designator Code" means a two (2) character (or three (3) character if adopted) designator issued by the International Air Transport Association ("IATA") to a specific air carrier to identify Flights or series of Flights operated by that air carrier, for publication as Scheduled flying or a Scheduled Flight.

**1-L-10** "Domestic Air Carrier" means an air carrier as defined in 49 U.S.C. Section 40102(a)(2) holding an air carrier certificate issued by the Administrator of the FAA under 14 C.F.R. Section 119.5.

**1-L-11** "Domestic Code Share Carrier" means a Domestic Air Carrier other than the Company that engages in flying under a Code Share Agreement with the Company (but not under or pursuant to a Livery Agreement or Revenue Share Agreement with the Company or a Company Affiliate), and also means any Domestic Air Carrier that conducts Flights using the Designator Code and brand name of that Domestic Code Share Carrier (e.g., US Airways Express) under a Revenue Share Agreement to the extent such Flights are operated with Regional Aircraft.

**1-L-12** "Domestic Code Share Flights" or "Domestic Code Share Flying" means flying operated by a Domestic Code Share Carrier under a Code Share Agreement with the Company.

**1-L-13** "Entity" means any business form of any kind including without limitation any natural person, corporation, company, unincorporated association, division, partnership, group of Affiliated Entities acting in concert, trustee, trust, receivership, debtor-in-possession, administrator or executor.

**1-L-14** "Equity" means: (i) common stock or other securities that carry the right to vote for one or more members of a board of directors or similar governing body, or shares or interests in a

partnership or limited partnership which shares or interests have general voting rights (all of the foregoing being collectively referred to as "Common Equity") and (ii) securities that are then currently or in the future exchangeable into, exercisable for, or convertible into Common Equity.

**1-L-15** "Flight" means the one-way operation of an aircraft between two airports with no Scheduled intervening stop.

**1-L-16** "Foreign Air Carrier" means an air carrier that is not a Domestic Air Carrier.

**1-L-17** "Foreign Airport" means an airport outside the United States and its Territories.

**1-L-18** "Foreign Code Share Flight" or "Foreign Code Share Flying" means a Flight or Flights by a Foreign Air Carrier, operating under and pursuant to a Code Share Agreement with the Company or a Company Affiliate.

**1-L-19** "Hub" of an air carrier other than the Company means an airport from which the air carrier, during the six (6) consecutive calendar months prior to the month for which a measurement is being made, Scheduled its own operation of an average of fifty (50) or more daily departures.

**1-L-20** "Industry Standard Interline Agreement" means an agreement or other arrangement between two (2) carriers or among three (3) or more carriers, such as the International Air Transport Association's "Multilateral Interline Traffic Agreements," establishing rights and obligations relating to the transportation of through passengers and/or through shipments by the party carriers.

**1-L-21** "International Route" means a Market in which one (1) or both airports are in a foreign country.

**1-L-22** "Jet Aircraft" means an aircraft powered by one (1) or more turbine engines with turbofan or turbojet propulsion, and includes future propulsion types whether ducted or unducted.

**1-L-23** "Livery Agreement" means an agreement or arrangement permitting an air carrier to display on its aircraft another air carrier's name, logo, or aircraft paint scheme.

**1-L-24** "Market" means a pair of airports, e.g., ORD-MSP.

**1-L-25** "New Small Narrowbody Aircraft" means a CS100, E190 or E195 aircraft, provided that such aircraft is neither in the Company Fleet as of the date of signing of this Agreement nor acquired through merger or acquisition of another air carrier.

**1-L-26** "Non-Stop" means a flight in a Market that does not include a Scheduled intervening take-off and landing.

**1-L-27** "Operated in United Express Flying" or "United Express Flying" (whether or not "operated" is capitalized) when used in reference to aircraft (examples include phrases such as, "50-Seat Aircraft operated in United Express Flying" or "50-Seat Aircraft in United Express Flying") means or refers to aircraft in service, undergoing maintenance, or used for operational spares at a United Express Carrier.

**1-L-28** "Parent" refers to United Continental Holdings, Inc. ("UCH") or any other Entity that has majority control of the Company, whether directly or indirectly, through the majority control of other Entities that have majority control of the Company.

**1-L-29** "Regional Aircraft" means one (1) or more (including all) of the following aircraft (as defined below):  37-Seat Turboprop Aircraft, 50-Seat Aircraft, 70-Seat Aircraft and 76-Seat Aircraft.

"37-Seat Turboprop Aircraft" means Turboprop Aircraft certificated in the United States for operations with thirty-seven (37) or fewer passenger seats and with a maximum certificated gross takeoff weight in the United States of 37,000 or fewer pounds.

"50-Seat Aircraft" means aircraft certificated in the United States for fifty (50) or fewer passenger seats and a maximum certificated gross takeoff weight in the United States of 65,000 or fewer pounds. The definition of "50-Seat Aircraft" does not include "37-Seat Turboprop Aircraft."  If a 50-Seat Aircraft is certificated for fifty (50) or fewer passenger seats when first placed into service by a United Express Carrier but is subsequently certificated for operation in the United States with a capacity in excess of fifty (50) passenger seats, this aircraft type may continue to be operated by United Express Carriers as long as all United Express Carriers operate such aircraft type with no more than 50 passenger seats and no more than 65,000 pounds gross takeoff weight.

"70-Seat Aircraft" means aircraft configured with more than fifty (50) passenger seats but no more than seventy (70) passenger seats, and certificated in the United States with a maximum gross takeoff weight of 86,000 or fewer pounds.

"76-Seat Aircraft" means aircraft configured with more than seventy (70) passenger seats but no more than seventy-six (76) passenger seats, and certificated in the United States for ninety (90) or fewer passenger seats and with a maximum United States certificated gross takeoff weight of 86,000 or fewer pounds.

**1-L-30** "Revenue Share Agreement" means an agreement or arrangement between or among two (2) or more air carriers or their Affiliates, providing for any form of:

- Capacity purchase,

- Fees for Scheduled block hours or departures,

- Revenue sharing from flight operations,

- Profit sharing from flight operations,

- Margin sharing from flight operations,

- Purchase of blocks of passenger seats on an air carrier for sale or resale by a different air carrier.

For purposes of this definition, the following provisions in an agreement or arrangement do not make it a Revenue Share Agreement: (i) reimbursement of distribution costs, or (ii) payments or receipts under standard industry prorate agreements, standard industry interline service charge agreements, standard industry re-accommodation agreements, or standard industry revenue settlement agreements.

**1-L-31** "Rolling Twelve-Month Period" means a period of twelve (12) consecutive calendar months beginning on the first day of a calendar month, e.g., January-December, February-January.

**1-L-32** "Round Trip" means a pair of flights to and from one city in a Market to the other, e.g. ORD-STL-ORD.

**1-L-33** "Schedule," "Scheduled," or "Scheduling" with respect to flying or a Flight means flying or a Flight that is published in the OAG, Innovata, or successor system.

**1-L-34** "Turboprop Aircraft" means an aircraft, other than a Jet Aircraft. A Turboprop Aircraft does not include future engine configurations such as unducted fans.

**1-L-35** "UCH" means United Continental Holdings, Inc., its Successors, and any other Entity of any name that acquires Control of the Company.

**1-L-36** "United Express Carrier" means a Domestic or Foreign Air Carrier that operates United Express Flying.

**1-L-37** "United States," when referring to geographical extent means only the States of the United States of America and the District of Columbia.

**1-L-38** "United States and Territories" means the United States and its territories and possessions, including but not limited to the Commonwealth of Puerto Rico and Guam.

| MOU 27 – Instructor/Evaluator and FRMS Flights | Incorporated into Section 23 |
| MOU 28 – LOA 37 Clarifications | MOU 16-01 |
| MOU 29 – FSAP | MOU 16-02 |
| MOU 30 – Treatment of Canceled Post-Loaded Unpaid Absence | Incorporated into Section 20 |
| MOU 31 – Leaves of Absence and Vacation Pay/Sick Accrual | Incorporated into Section 12 |
| MOU 32 – Administration of LTD Payroll Deductions | MOU 17-01 |

## 25-C    ALPA Ratification Process

**25-C-1** No collective bargaining agreement (including Letters of Agreement or "LOAs"), shall become effective between United Airlines and ALPA without the signature of ALPA's President, unless both parties specifically consent that an agreement may begin on an interim basis pending the receipt of the President's signature. On ALPA's behalf, consent to proceed on an interim basis may be provided by the United MEC Chairman.

**25-C-2** Notwithstanding Section 25-C-1, the parties agree that an MOU may be implemented without the signature of ALPA's President. An MOU is an agreed upon interpretation or application of a specific term or condition of employment already in existence and requires, on ALPA's behalf, only the approval and signature of the MEC Chairman.

**25-C-3** No LOA, MOU or protocol may be entered into, even on an interim basis, by any MEC Committee or individual MEC member or officer without the approvals set forth in this Section 25-C.

IN WITNESS WHEREOF, the parties hereto have signed this Agreement this 18th day of December, 2012.

For United Airlines, Inc.:                    For the Air Line Pilots Association, International:

_____        _____
Mike Bonds                                   Captain Donald L. Moak
Executive Vice President                      President
Human Resources and Labor Relations           Air Line Pilots Association, International

Captain Fred Abbott
Senior Vice President
Flight Operations

Captain Jay Heppner
Chairman
UAL MEC

P. Douglas McKeen
Senior Vice President
Labor Relations

Captain Jay Pierce
Chairman
CAL MEC

Dan Casey
Vice President
Labor Relations

Captain Dave Owens
Negotiating Committee Chairman
CAL MEC

First Officer Phil Otis
Negotiating Committee Chairman
UAL MEC

First Officer Brad Hunnewell
Negotiating Committee Vice Chairman
UAL MEC

First Officer Jeff Brown
Negotiating Committee
CAL MEC

Captain Corey Ferguson
Negotiating Committee
UAL MEC

First Officer Phil Lomness
Negotiating Committee
CAL MEC

*MOU 12-07   Parent Agreement*

**UNITED CONTINENTAL HOLDINGS, INC.**
**UNITED AIR LINES, INC.**
**CONTINENTAL AIRLINES, INC.**

December 18, 2012

Lee Moak, President
Air Line Pilots Association
1625 Massachusetts Avenue, N.W.
Washington, D. C. 20036

Re: Corporate Structure

Dear Captain Moak:

I write to confirm the following agreements between the Air Line Pilots Association, International ("ALPA") and United Continental Holdings, Inc. ("UCH"), United Air Lines, Inc. ("United") and Continental Airlines, Inc. ("Continental") (collectively, the "Company") in the negotiations leading to the 2012 ALPA-United collective bargaining agreement (the "Agreement"). Defined terms in this letter have the same meaning as in Section 1 of the Agreement.

1. Upon the effective date of the Agreement, Continental (to the extent it remains a legally organized entity) will be bound by the Agreement in the same manner as United, and every reference in the Agreement to the "Company" or "United" shall be deemed to refer to Continental so long as it exists as a legally organized entity.

2. UCH agrees that it is an Affiliate of United and that it is bound by Section 1 of the Agreement in the same manner as United.  UCH and United further agree that they will not conclude, facilitate or permit any agreement or arrangement that establishes any Affiliate, other than a Feeder Carrier, that is an air carrier, Controls an air carrier or is under the Control of an air carrier, unless the Affiliate agrees in writing to be bound by Section 1 of the Agreement in the same manner as UCH and United.

3. The potential corporate mergers or consolidation of United and Continental or of United, Continental, and UCH shall not trigger any successorship obligations under Section 1-D of the Agreement or otherwise be deemed a violation of the agreements between the parties.

4. Any disputes between ALPA and United, between ALPA and Continental, between ALPA and UCH, or between ALPA and any entity arising out of the merger or consolidation of such corporations, arising out of grievances or the interpretation or application of the Agreement, shall fall within the jurisdiction of the ALPA-United Pilots' System Board of Adjustment.

**Appx92**

Nothing in this letter shall be construed to require a corporate merger of the entities described above or to require any particular form of corporate structure, provided that the operating entity or entities and parent corporation, if any, remain bound by the Agreement, and provided further that UCH, United and Continental will execute a Complete Operational Merger in accordance with the Transition and Process Agreement between Continental Airlines, Inc., UAL Corporation, and United Air Lines Inc., dated September 26, 2010.

This letter becomes effective on the date of signing and will remain in effect concurrent with the Agreement.

Sincerely,

_____
Michael P. Bonds
Executive Vice President, Human Resources and Labor Relations
United Continental Holdings, Inc., United Air Lines, Inc. and Continental Airlines, Inc.

Accepted and agreed to this 18th day of December, 2012.

_____
Captain Donald L. Moak, President
Air Line Pilots Association, International

PL

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ERIC WHITE, on behalf of himself and others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 19 CV 00114 |
| v. | ) ) | Hon. Charles R. Norgle |
| UNITED AIRLINES, INC. and UNITED CONTINENTAL HOLDINGS, INC., | ) ) ) | |
| Defendants. | ) ) | |

## ORDER

The pending motions to appear pro hac vice [5] and [14] are granted. Defendants' motions to dismiss [17] and [20] filed before Plaintiff's amended complaint are denied as moot. Defendants' operative motion to dismiss [31] is granted. The case is dismissed with prejudice. The Clerk is directed to enter judgment in favor of Defendants pursuant to Fed. R. Civ. P. 58.

## STATEMENT

Plaintiff Eric White brings this putative class action under the Uniformed Services Employment and Reemployment Act ("USERRA"), 38 U.S.C. § 4301 *et seq*., on behalf of certain current and former employees of United Continental Holdings, Inc. ("UCH") and United Airlines, Inc. ("UA") (collectively, "Defendants"). Plaintiff claims that Defendants, in violation of USERRA, failed to properly compensate employees who took short-term military leave and failed to properly credit those employees under the UCH Profit Sharing Plan ("the Plan"). In essence, Plaintiff claims Defendants should have paid him for his time on short-term military leave. Pending before the Court is Defendants' motion to dismiss under Fed. R. Civ. P. 12(b)(6). For the following reasons, the motion is granted with prejudice.

The facts relevant to the determination of this matter are straightforward.[1] Plaintiff is a pilot for UA and for the United States Air Force Reserve. Plaintiff has served continuously as a pilot in the Air Force, including on active duty and on reserve duty, since 2000, which has overlapped with his employment with Defendants (or their predecessor company) since 2005. During that period, Plaintiff has routinely taken military leave, both short- and long-term, and Plaintiff (and other similarly situated individuals) has not been compensated when he takes short-term military leave[2] and has not been credited within the Profit Sharing Plan for that time (as the amount due under the Plan based in part on wages earned). Plaintiff alleges that this policy of non-payment has been in place at least since 2010 and may span back to 2006. On the other hand,

---

[1] These facts are drawn directly from Plaintiff's amended complaint and, at this stage of the litigation, are taken as true by the Court.

[2] In the amended complaint, Plaintiff describes short-term leave as leave of less than 30 days.

Defendants do pay employees for other types of short-term leave, including for jury duty and sick days, which Plaintiff claims are "comparable" forms of leave.

With respect to the Plan, Defendants offer a profit sharing award for eligible employees. The amount of profit each employee shares in is calculated based on a formula that includes, as part of the pay-out calculation, the wages the employee has earned in the relevant time period. Thus, if Plaintiff's wages increased based on payment for short-term military leave, his piece of the profit-sharing pie would grow proportionally, subject to the formula.

From these facts, Plaintiff brings three specific claims (each based on USERRA): first, per 38 U.S.C. § 4316(b)(1),[3] Plaintiff alleges it was a violation for Defendants to fail to pay wages during periods of short-term military leave; second, in essence, Plaintiff alleges Defendants' initial violations created an additional residual violation of 38 U.S.C. § 4316(b)(1) because it caused an improper reduction in the amount the employees would recieve under the Profit Sharing Plan; and, third, Plaintiff alleges that Defendants' failure to properly pay under the Profit Sharing Plan was an independent violation of 38 U.S.C. § 4318, which places certain requirements on employee pension benefit plans.

Defendants counter in several ways—including with a statutory interpretation-based argument that USERRA does not entitle Plaintiff to the type of pay for short-term military service that he claims. In the Court's view, this argument acts as a first domino that, if it falls, necessarily topples the second claim. The Court thus turns first to this issue before a discussion of Plaintiff's third claim.

In deciding this motion to dismiss, the Court accepts "all well-pleaded allegations of the complaint as true and view[s] them in the light most favorable to the plaintiff." Indep. Trust Corp. v. Stewart Info. Servs. Corp., 665 F.3d 930, 934 (7th Cir. 2012). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint "must actually *suggest* that the plaintiff has a right to relief, by providing allegations that raise a right to relief[.]" Id. at 934 (internal quotation marks and citation omitted) Legal conclusions pleaded within Plaintiff's complaint are not entitled to be taken as true. R.J.R. Servs., Inc. v. Aetna Cas. & Sur. Co., 895 F.2d 279, 281 (7th Cir. 1989).

In a nutshell, Plaintiff argues that Defendants, given their policy of compensating employees for certain other types of short-term leaves of absence, should be required to pay Plaintiff for his time on short-term leave in military service. The basis for this claim, Plaintiff argues, stems from the language of Section 4316(b)(1) and the definition of the word "benefit" within the statute at 38 U.S.C. § 4303(2).

Paraphrasing slightly, Section 4316(b) provides that individuals who are absent from work due to service in the military shall be "entitled to such other rights and benefits . . . as are generally provided by the employer" to employees who are on furlough or leave of absence "under a contract, agreement, policy, practice, or plan in effect[.]" 38 U.S.C. § 4316(b)(1)(B). The phrase

---

[3] This provision reads, in relevant part:

> (b)(1) . . . a person who is absent from a position of employment by reason of service in the uniformed services shall be—
>
> > (A) deemed to be on furlough or leave of absence while performing such service; and
> >
> > (B) entitled to such other rights and benefits not determined by seniority as are generally provided by the employer of the person to employees having similar seniority, status, and pay who are on furlough or leave of absence under a contract, agreement, policy, practice, or plan in effect at the commencement of such service or established while such person performs such service.

2

**Appx95**

"rights and benefits" is defined in the statute as:

> The term "benefit", "benefit of employment", or "rights and benefits" means the terms, conditions, or privileges of employment, including any advantage, profit, privilege, gain, status, account, or interest (including wages or salary for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice and includes rights and benefits under a pension plan, a health plan, an employee stock ownership plan, insurance coverage and awards, bonuses, severance pay, supplemental unemployment benefits, vacations, and the opportunity to select work hours or location of employment.

38 U.S.C. § 4303(2). From this text, Plaintiff argues that because Defendants have a policy of paying out sick days and days spent on jury duty—a benefit granted to employees in those situations—Defendants are required to pay service members for their time in which they are absent from work because of military service. The argument basically has three steps. First, jury duty pay (for example) is a benefit within the meaning of the statute that is given to other employees. Second, short-term military leave is similar in nature to jury duty. Therefore, third, short-term military service should be treated similarly to jury duty and to withhold pay from one and not the other is to deprive the service members of a benefit (wages) to which they are statutorily guaranteed. Plaintiffs point to no controlling court that has extrapolated private, fully-paid military leave stemming from a business's policy of paying individuals who miss work for jury duty or due to illness. To support this theory, Plaintiff cites non-binding or slightly off-target authority.

On the other side, Defendants point to clear pronouncements, including from the Seventh Circuit, stating that USERRA does not require private businesses to provide paid military leave. E.g. Miller v. City of Indianapolis, 281 F.3d 648, 650 (7th Cir. 2002) ("USERRA prohibits discrimination by, among other things, denying any benefit of employment on the basis of the employee's membership in the uniformed services. It does not expressly require paid military leave."). Federal agencies tasked with implementing USERRA have made similar pronouncements. E.g. 20 C.F.R. § 1002.7(c) ("USERRA does not require an employer to pay an employee for time away from work performing service."); 20 C.F.R. § 1002.7(d) (2005) ("even though USERRA does not require it, an employer may provide a fixed number of days of paid military leave per year"); U.S. Dep't. of Justice, *Employment Rights of the Nat'l. Guard and Reserve*, pp. 31 (USERRA "requires only an unpaid leave of absence.").

To be clear, Plaintiff is not arguing for a per se requirement that all businesses pay for employees' short-term military leave; it is arguing that businesses like Defendants with a policy of paying individuals to attend jury duty must pay for service members' short-term leave. This argument lacks merit. If Congress had intended to create a statutory regime in which any company which offers paid leave for jury duty was also required to pay for service members' leaves of absence, it would have done so clearly. As noted above, it is well established that Congress did not intend to create a universal requirement for private businesses to pay for reservists' absences, and it is contrary to any reasonable interpretation to hold that the language of the statute should be interpreted as what is essentially a de facto rule swallowing that previously clear pronouncement. See Monroe v. Standard Oil Co., 452 U.S. 549, 564 (1981) ("If Congress had wanted to impose an additional obligation upon employers, guaranteeing that employee-reservists have the opportunity

to work the same number of hours, or earn the same amount of pay that they would have earned without absences attributable to military reserve duties, it could have done so expressly.").[4]

To that end, and with the above in mind, the Court agrees with Defendants' textual analysis. It is contrary to the express language of the statute to hold that a business is required to pay a reservist wages for time not worked. Moreover, the Court disagrees with the contention that jury duty is comparable in nature—in the way that Congress intended—to reservist duties. Although both may be sporadic and uncontrollable in timing, all citizens (including those in reserve military roles) are subject to jury duty simply by nature of living in America, whereas military duties—which no doubt are honorable and likewise essential to our society—are voluntarily joined (in present times).

In short, if businesses were to be required to pay for short-term military leaves of absence simply because they offer sick days or pay for jury duty, it is this Court's view that it is within Congress's discretion to make that decision, and it has not done so under the current language in Section 4316.

As to Plaintiff's second claim, the Court agrees with Defendants that because Plaintiff has not been denied a "right and benefit" to which he was entitled, he cannot state a claim.

Finally, with respect to Count III, Plaintiff alleges that Defendants violated USERRA § 4318 by failing to treat military leave as service with the employer for purposes of calculating benefits under the Plan as required by the statute. Defendant argues that the Plan at issue is not an "employee benefit pension plan" covered by Section 4318 and that the claim thus fails. Specifically, Defendants argue that an "employee benefit pension plan" under Section 4318 are limited to (1) those that qualify as pension plans under ERISA § 3(2), 29 U.S.C. § 1002(2) or (2) plans of the character specifically referenced in a Department of Labor regulation codified at 20 C.F.R. § 1002.260(a), which states that "[A]ny such [ERISA-covered] plan maintained by the employer or employees is covered under USERRA" and states that USERRA also covers certain pensions plans not covered by ERISA, such as those sponsored by a State, government entity, or church for its employees." Id. The Court agrees that "such as" is a "phrase of general similitude indicating that there are includable other matters of the same kind which are not specifically enumerated by the standard." Donovan v. Anheuser-Busch, Inc., 666 F.2d 315, 327 (8th Cir. 1981). Put differently, because Defendants are not of a similar character to those enumerated exceptions—and indeed, are instead a private business—the Court holds the Plan falls outside of the type contemplated by Section 4318 and thus Plaintiff's third count is dismissed.

In sum, each of Plaintiff's arguments fail as a matter of law, and thus the case is dismissed with prejudice.

IT IS SO ORDERED.

ENTER:

_____
CHARLES RONALD NORGLE, Judge
United States District Court

DATE: July 10, 2019

---

[4] Where Congress has sought to impose obligations on an employer to pay for military-related leave time (namely, in the case of the federal government), it has done so explicitly. See 5 U.S.C. § 6323(a)(1).

PK

ILND 450 (Rev. 10/13) Judgment in a Civil Action

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

ERIC WHITE,

Plaintiff(s),

v.

Case No.  19 C 114
Judge CHARLES R. NORGLE

UNITED AIRLINES and UNITED
CONTINENTAL HOLDINGS, INC. ,

Defendant(s).

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐ in favor of plaintiff(s)
and against defendant(s)
in the amount of $           ,

which ☐ includes        pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☐ in favor of defendant(s)
and against plaintiff(s)

Defendant(s) shall recover costs from plaintiff(s).

---

☒ other: this case is dismissed with preudice.

---

This action was *(check one)*:

☐ tried by a jury with Judge        presiding, and the jury has rendered a verdict.
☐ tried by Judge     without a jury and the above decision was reached.
☒ decided by Judge Norgle on a motion to dismiss.

Date:  7/10/2019

Thomas G. Bruton, Clerk of Court

Eric Fulbright , Deputy Clerk

**Appx98**

## CERTIFICATE OF COMPLIANCE

This appendix complies with Circuit Rule 30(d) because all the materials required

by Circuit Rules 30(a) and 30(b) are included in the appendix.

> */s/ Jonathan E. Taylor*
> JONATHAN E. TAYLOR
> *Counsel for Plaintiff-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2020, I electronically filed the foregoing appendix with the Clerk of the Court for the U.S. Court of Appeals for the Seventh Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Jonathan E. Taylor*
JONATHAN E. TAYLOR
*Counsel for Plaintiff-Appellant*
